# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES A. WILSON, et al.,           )
                                   )
          Plaintiffs,              )
                                   )  Civil Action
v.                                 )  No. 05-399-JJF
                                   )
STANLEY TAYLOR, et al.,            )
                                   )
          Defendants.              )

          Deposition of JAMES A. WILSON taken pursuant to notice at the Delaware Correctional Center, 1181 Paddock Road, Smyrna, Delaware, beginning at 10:00 a.m. on Wednesday, May 9, 2007, before Vincent J. Bailey, Registered Professional Reporter and Notary Public.

APPEARANCES:

    STACEY XARHOULAKOS, ESQ.
    STATE OF DELAWARE, DEPARTMENT OF JUSTICE
      820 N. French Street, 6th Floor
      Wilmington, Delaware  19801
      For the Defendants

WILCOX & FETZER

1330 King Street - Wilmington, Delaware 19801

(302) 655-0477

www.wilfet.com

26

1  not listening to me, give you information because you
2  kept on walking.
3      Then, like I said, on Thursday we have a
4  setting in the hallway where it says inmate such and such
5  was -- we call it, each other, big brother cougars or a
6  family member. And we say big brother cougar, James, had
7  got a hold for walking off the floor, he didn't want to
8  receive any information, and then the co-facilitator will
9  execute the punishment for that.
10     And let's say, first time walking off the
11 floor, you get 30 days Molly, Ms. Butler -- I'm giving
12 you the short version. What happens is each day for 30
13 days you got to clean three rooms up of someone else's
14 room, because you walked off the floor. That's
15 accountability for that. Then they have you move, clean
16 my TV, move this around. All that, that's for walking
17 off the floor. So you don't have a lot of people walking
18 off the floor.
19     Q. Nobody wants to be cleaning up rooms?
20     A. Yes.
21     Q. You said something about losing points?
22     A. I think you get 3 points if you quit the program.
23     Q. Three points added to what?
24     A. We under the point system, so if you got 3 points

27

1  already, you get 3 more, that's 6. If you got 10 or 12,
2  you get 3 more, that's 15. That's MHU across the street.
3      Q. So if you get 15 points you are pointing into
4  maximum?
5      A. Right. I think it is 17 to 20, that's the SHU,
6  which is also over there. You got the SHU and MHU over
7  across the street.
8      Q. Okay. Before you entered the Green Tree program
9  you said you heard about it before. Have you ever wanted
10 to participate in the program?
11     A. Yes.
12     Q. Who did you talk to?
13     A. I talked to -- I was trying to get into the one
14 in SCI. I'm laughing because when I got your objection
15 it had all that information on there that you are asking
16 me.
17     I had talked to Ms. Ditto, because she was
18 getting one down there, federal funded. One time, I
19 think it was like five years, which I wasn't qualified.
20 Then it was down to two and a half years, then down to a
21 year now.
22     Q. Let's step back. Ms. Ditto, are you speaking of
23 Pat Ditto?
24     A. Yes.

28

1      Q. What was her role at SCI?
2      A. She's like head of treatment to my knowledge or
3  head of counselors.
4      Q. Do you have a relationship with Ms. -- I mean, a
5  professional relationship with Ms. Ditto?
6      A. I know her when she was at Ferris.
7      Q. She was with you in Ferris?
8      A. She was like a correctional officer out there,
9  youth officer, yes.
10     Q. Okay.
11     A. I got pretty good rapport with her. She's pretty
12 fair.
13     Q. She is pretty fair? Is that what you said?
14     A. Yes.
15     Q. So you knew her at Ferris and then when you went
16 to SCI, she's the treatment head there. Did you ever
17 have a relationship with her anywhere else in any other
18 institution?
19     A. Not that I recall.
20     Q. Did you ever go to her when you had problems or
21 issues that you wanted to be addressed?
22     A. Yes. A counselor I think was not classifying me
23 right one time. I wrote her, informed her that I
24 shouldn't have been classified here. She would respond.

29

1  She's very helpful, not only to me, but to basically
2  everybody.
3      Q. So she helped you with the classification issue?
4      A. Right.
5      Q. Was that resolved?
6      A. Yes. Trying to give me more points. I left from
7  Gander, went to SCI, I only had 6 points. When I got to
8  SCI they said, well, Gander Hill don't matter, we do our
9  point system a little different. I wound up with 8 or 9
10 points.
11     I was writing her, explaining how I came
12 down I should have the same points. I think she modified
13 or rectified it or consulted with her counselor that's
14 underneath her.
15     Q. So is that why you went to her asking about Green
16 Tree, because you thought she might be able to get you
17 into the program?
18     A. Yes. I was in the Merit building. I had a
19 couple of friends that was going to be facilitators over
20 there and work over there. Basically a lot of guys work
21 under Ms. Ditto or know her. And I heard they was
22 starting Green Tree program down there and they was going
23 to interview some people for the facilitator position.
24 At that time I didn't have no drug treatment program

Wilson v. Stanley Taylor, et al
James A. Wilson

**34**

1  Q. All right. Give me one second.
2     One other thing I want to go back to is when
3  you were talking about the Green Tree program at SCI, you
4  said some of your other friends were going to be in the
5  program?
6  A. Yes.
7  Q. Who is that?
8  A. Jeff Crippens, Roger Crippens.
9  Q. Are they related?
10 A. Yes.
11 Q. How?
12 A. Cousins.
13 Q. Did they become a part of the program?
14 A. Yes.
15 Q. What is their role?
16 A. Jeff is facilitator and Roger is basically like
17 the clerk or secretary.
18 Q. All right. We talked before about how this is
19 not a class action, the judge has not held that it is.
20 So to that end, any claims in the case have got to be
21 individual. So when I ask you questions, I want you to
22 answer with regard to you and not necessarily to the
23 other plaintiffs. Do you understand that?
24 A. Yes.

**35**

1  Q. Who is Stan Taylor?
2  A. Ex-commissioner for Department of Corrections.
3  Q. What do you understand his job responsibilities
4  to be -- or were?
5  A. Oversee the correctional facilities throughout
6  Delaware.
7  Q. Can you give a physical description of him?
8  A. I would say to make sure like classifications,
9  job opportunities, quality within the correctional
10 facility, education within the facility, treatment within
11 the facility, handed out or administered to everyone
12 equally.
13 Q. Where do you get that from? Why do you think
14 those are his job duties?
15 A. Because he's the commissioner.
16 Q. Have you ever met him?
17 A. Yes.
18 Q. Have you ever spoken with him?
19 A. No.
20 Q. Have you ever spoken with him about this case?
21 A. No.
22 Q. Or corresponded to him about this case?
23 A. That's a possibility. I might have put something
24 in saying the classification system down here is not

**36**

1  proper or it is not equal down here, but I can't really
2  recall, so I really don't know.
3     Usually it is a process, I'm saying you
4  write a grievance, that gets denied, then summons the
5  commissioner or bureau chief. So I can't say whether I
6  did or not, because I might have just jumped straight to
7  a civil suit, but it's a possibility I might have wrote
8  him and complained about some of these issues. I got so
9  many cases, so I cannot -- I take my hat off to you.
10 Q. So you can't recall specifically in this case
11 whether or not you wrote to Stan Taylor?
12 A. Right.
13 Q. Okay. Do you know why you have named him in this
14 particular lawsuit?
15 A. Because he's the commissioner. I thought it was
16 the formality, name the commissioner because he oversees
17 the warden, et cetera. So that's why I named him.
18 Q. Do you understand the difference between someone
19 who supervises someone and an employee who does something
20 directly?
21 A. Yes.
22 Q. Do you feel as if Stan Taylor's role is as
23 supervisor?
24 A. He would be familiar with the situation in SCI

**37**

1  when it comes to job opportunities, education, treatment,
2  classification, recreation.
3  Q. Do you think that every time the warden and
4  deputy warden make a decision that they go to the
5  commissioner for every decision?
6  A. No.
7  Q. What specifically do you feel Stan Taylor did in
8  this case to violate your civil rights?
9  A. Allowed the warden of Georgetown to run a system
10 which displays or depicts unequal opportunities when it
11 comes to white and black in job classifications,
12 disciplinary actions.
13 Q. When you say "allowed," what do you mean by
14 "allowed"?
15 A. I believe he has some type of knowledge of what
16 goes on in SCI or I believe he might look over his
17 records so he can understand what's going on in that
18 department, whether it is classification, whether
19 disciplinary actions, jobs. So I believe he has some
20 type of knowledge of that and he allowed that to run.
21 Q. Do you think he has some sort of knowledge of
22 discrimination at SCI?
23 A. Maybe not directly, because he probably don't
24 weigh the percentage of who is working where, who got

10 (Pages 34 to 37)

Wilcox and Fetzer, Ltd.   Registered Professional Reporters   302-655-0477

Wilson v. Stanley Taylor, et al
James A. Wilson

**38**

1  fired or disciplinary percentage of white versus black.
2  He probably don't go into that depth, but he probably has
3  knowledge of who gets sprayed the most, who gets sent to
4  ASDA the most, high security the most.
5    Q.  Do you think that someone keeps statistics on
6  those types of things?
7    A.  No.  But they keep paperwork and I think they go
8  by for instance and say black on there, so I think it
9  also say inmate, race, they put black.  When you read it,
10 you keep seeing that name black come up.  It is like
11 (indicating).
12   Q.  Do you know how many inmates are incarcerated in
13 Delaware?
14   A.  According to the paper the other day,
15 approximately 7,000, according to the new deputy attorney
16 Carl Danberg.
17   Q.  Do you think that of those 7,000 inmates that the
18 commissioner looks at papers for all of them?
19   A.  In different institutions, yes.
20   Q.  What do you think -- specifically, your
21 allegations in this case are that you have been
22 discriminated against because of your race.  Is that
23 right?
24   A.  That's one of the claims.

**39**

1    Q.  What do you think specifically Stan Taylor did to
2  discriminate against you because of your race?
3    A.  He allowed policies to be put in place, he had
4  not objected to them.
5    Q.  What policies do you mean?
6    A.  Classification policy, job opportunity policy,
7  and disciplinary policy.
8    Q.  Are these written policies?
9    A.  To my knowledge they are written.
10   Q.  You think there's something written in a policy
11 to discriminate based on your race?
12   A.  No.
13   Q.  So that's what I'm asking:  Why do you think Stan
14 Taylor discriminated based on your race?
15   A.  I think he allowed these things to take place and
16 as commissioner he should know if these things are taking
17 place and if they are he should be able to rectify.
18   Q.  You said "these things" --
19   A.  Job discrimination, disciplinary action
20 discrimination, classification discrimination.
21   Q.  Job discrimination, how were you discriminated
22 against because of your job?
23   A.  Once again, you are talking directly to me,
24 right?

**40**

1    Q.  That's right.
2    A.  Okay.  How was I as an individual?  I wasn't,
3  because I worked as a tutor in SCI.
4    Q.  How about disciplinary, how were you
5  discriminated against based on your race with regard to
6  discipline?
7    A.  Once again, I probably had like maybe one or two
8  write-ups down there, so once again I was not.
9    Q.  One or two write-ups while at SCI?
10   A.  Yes, something minor, like an extra piece of
11 fruit or something.
12   Q.  For classification, how were you discriminated
13 against based on your race?
14   A.  Once again, me specifically, I wasn't, except --
15 wait a minute.  Then again, getting me to DCC, I would
16 say I was because there's a guy named Alan Span that was
17 sent to ASDA and they kept his room for him.  They sent
18 him back to the Merit building, gave him his tutor job
19 back, versus me, they sent me to ASDA, sent me to PI
20 building, then classified me to DCC
21   Q.  Alan who?
22   A.  He was a tutor down there, but I was in the same
23 Merit building he was in on the same side.
24   Q.  Did he work with you ever?

**41**

1    A.  I worked in the James Grove High School
2  department.  He worked I think more or less like a pre
3  GED as a tutor for GED.
4    Q.  So you both worked as tutors, but in different
5  areas?
6    A.  Yes.
7    Q.  How do you know all of this about Alan?
8    A.  I was on the same east side Merit building with
9  him.  He left for like three weeks approximately and then
10 came back and they kept the same room for him, upstairs,
11 and gave him his clothes back and his job back.
12   Q.  Do you know why he was initially taken from the
13 Merit building?
14   A.  I heard hearsay, but I'm not for sure.
15   Q.  What did you hear?
16   A.  That he made contact with his victim.
17   Q.  Is most of the information that you have about
18 Alan through other people?
19   A.  About why he was moved?
20   Q.  That's right.
21   A.  Yes.  But the policy or the procedure is once you
22 leave the Merit building, you automatically lose your
23 cell.  Then you got to go back to medium or PI and wait
24 for a cell to open again to be moved back to the Merit

11 (Pages 38 to 41)

Wilson v. Stanley Taylor, et al
James A. Wilson

---

Page 42

building. And in his case, cell was reserved. It was held for him.
Q. What policy or procedure -- you said it is policy. Where is that policy?
A. I would think it is in the DOC policy.
Q. You think?
A. Yes.
Q. Have you read it?
A. No. I just mean it function, like if you go to ASDA, you lose your cell, you go back to medium, you get put back on the list to go back to the Merit building. They might take 8 months, might take a year or two, and then you eventually come back. Merit is supposed to be a privileged building, so that's a known fact. When he moved, they held his room and brung him from ASDA straight back to his room in the Merit building.
   I know I had this one guy, he was in the Merit building. This one guy supposedly told the officer that he had a problem with this guy or he threatened him. They moved the guy to ASDA, they did investigation, it wasn't true. He beat the write-up. They still sent him to medium, PI, waited for a room to -- they didn't save his room for him. They waited for the room, then they moved him back. So that's normal policy or normal

Page 43

practice.
Q. Do you think it is possible that this is like you said normal practice and not a written policy?
A. I would assume, yes, because I haven't seen no information on it.
Q. Do you think there's certain circumstances where it might be applied in a different way?
A. Of course.
Q. The information that you had about Alan's room being reserved for him, where did you get that information?
A. I was on tier. I watched. I seen it. They didn't put another inmate in that cell with his roommate.
Q. So when Alan went to -- he was moved from Merit to ASDA. Is that right? When he went to ASDA, you were not at the time in ASDA?
A. I was in the Merit building on the east side.
Q. Do you recall when that was?
A. Approximately January -- I can't -- probably January somewhere '06 to February, March, something like that. I know he stayed like three weeks. Then I went to ASDA in March, so it was approximately February, January before I went to ASDA.
Q. So it was early 2006?

Page 44

A. Yes.
Q. What race is Alan Span?
A. Caucasian.
Q. What part of the Merit building was he housed in?
A. The east side.
Q. You said you don't know for sure or you didn't know for sure why he was moved. Were you ever able to confirm that by talking to him or anyone?
A. To my knowledge we had a conversation and he said something that they said he contacted his victim or he wrote his victim.
Q. Why were you moved to ASDA?
A. Really, I don't know. I got a piece of paper when I was back there saying I was under investigation.
Q. So you did understand at the time that you were under investigation?
A. Yes.
Q. Is that typical process that inmates are moved out of Merit to ASDA when they are under investigation?
A. Yes, to my knowledge.
Q. Before you were moved where were you in the Merit building?
A. East side.
Q. How long did you stay in ASDA for?

Page 45

A. About 6, 7 days I think.
Q. Then what happened?
A. They moved me to the PI building.
Q. When you were moved there did anyone tell you why you were being moved?
A. Said the investigation was still going on.
Q. How long did you stay in the PI building?
A. Until I came up here.
Q. Do you remember how long that was?
A. Approximately like -- came up here in June, two months.
Q. Two months in PI building?
A. Yes.
Q. Then you were moved here to DCC, correct?
A. Yes.
Q. Enrolled in the Green Tree program, correct?
A. Put in Green Tree program.
Q. Is "enrolled" the wrong word there?
A. Enroll is like I did it freely.
Q. Well, you said earlier you wanted to be in Green Tree. Isn't that right?
A. Not at DCC. SCI.
Q. Why is that?
A. Probably different mentality, different

---

12 (Pages 42 to 45)

Wilcox and Fetzer, Ltd.    Registered Professional Reporters    302-655-0477

Wilson v. Stanley Taylor, et al
James A. Wilson

46

1  procedures. I think you get good time down there. You
2  don't get good time for this one. All I was getting good
3  time when I was working.
4      Q. You thought that the Green Tree program mentality
5  at SCI and at DCC would be different?
6      A. Of course. It is something, it is beginning and
7  you being a part of it, trying to help build and
8  construct it, versus something already in existence.
9  Like I say, you get good time. The people around there I
10 know I can probably work with, versus coming up here with
11 trying to get acquainted with -- I'm not really
12 interested in getting acquainted with these people.
13     Q. So you had comfortable relationships with other
14 inmates at SCI?
15     A. Sure.
16     Q. You didn't necessarily want to move to a new
17 place?
18     A. I liked my job as a tutor down there. And the
19 good time that I was earning.
20     Q. Let's talk about Rick Kearney. You have named
21 him in this lawsuit also?
22     A. Yes.
23     Q. Who is Rick Kearney?
24     A. Warden of SCI. Now I guess he's bureau chief.

47

1      Q. When he was the warden of SCI, what did you
2  understand his job responsibilities to be?
3      A. To be a warden, oversee everything that's down
4  there.
5      Q. To oversee? Is that right?
6      A. Yes. Oversee the DOC policies and rules and
7  regulations.
8      Q. Have you ever had any conversation with the
9  warden?
10     A. I have wrote him I'm sure. See him and Stan
11 Taylor, they came back Merit building several times.
12     Q. Did you speak with them when they came here?
13     A. Not no general conversation.
14     Q. You never had a conversation with, verbal
15 conversation with Warden Kearney about this suit?
16     A. Not that I can recall.
17     Q. Do you recall if you ever wrote to him about the
18 lawsuit?
19     A. I probably wrote to him about some issues, not
20 about the lawsuit itself.
21     Q. When you say "issues," do you mean the same
22 issues that you brought in the lawsuit?
23     A. Right.
24     Q. Do you recall when you wrote to him?

48

1      A. No. Probably just laying the foundation of
2  before you file a civil suit, write a grievance, try to
3  resolve it, write maybe the warden or the commissioner or
4  bureau chief, anybody. Before you file a civil
5  complaint, you try to resolve it.
6      Q. Why did you name him in this suit?
7      A. Because he's the warden of SCI at that time and
8  his job I believe was to oversee the DOC rules and
9  regulations and look at them, study them, make sure they
10 are balanced.
11     Q. What specific reason -- what did he do to violate
12 your rights?
13     A. At this time -- that's right, I have to keep the
14 frame of mind that it is about me right now.
15        He allowed them to move me from the Merit
16 building, allowed my job to be taken from me, as well as
17 my cell, classified me up here.
18     Q. Allowed you to be moved, how do you know that he
19 allowed it?
20     A. Well, I'm sure he talks to his deputy warden.
21 Deputy warden is the one that moved me, signed for it to
22 be moved. So I know the deputy warden had to report to
23 him I would assume on daily activity at SCI.
24     Q. So you are assuming that because he's the warden,

49

1  that he made the decision. Is that right?
2      A. Or the deputy warden made the decision, but since
3  the deputy warden is a representation of the warden in
4  the warden's absence, I would say, yes, he knew or had
5  some type of knowledge.
6      Q. Do you think the deputy warden goes to the warden
7  for every decision that he makes?
8      A. Not if he's there, but I think he briefs him on
9  certain ones, especially dealing with James Wilson.
10     Q. What does that mean?
11     A. They don't like guys who write grievances. They
12 don't like guys that do civil suits. They had told -- a
13 certain CO had informed me that they wanted to move me
14 because I write grievances and stuff, sure.
15        So if he moved James Wilson, I'm sure he
16 says, you know, we moved Mr. Wilson to ASDA. I'm sure he
17 did.
18     Q. You thought because you are James Wilson, that if
19 you were moved there had to be a conversation about?
20     A. I know James Wilson, because of the things I do
21 or stand up for.
22     Q. Do you think that you were moved because you file
23 a lot of grievances or because of your race?
24     A. I was moved because of the investigation they

13 (Pages 46 to 49)

**50**

say, because -- see, this inmate, for instance, Chris something, he informed me about a CO wanting to set up another CO or told him if he found some information out on this CO, that he gave it to him, he would bring him in cheese cake.

I walked around with this on my mind for several days, because I didn't ask for this information. But the CO as well as inmate that they thought had some type of special relationship or whatever -- to my knowledge, they have been looking at this inmate and this CO for years, way before I got to the Merit building. I knew him from being up here, and from being down Georgetown before. We played basketball, things like that together, give each other information. So it was like incumbent upon me to say, this is what I heard.

I also informed the CO, which was Ms. Watson, and she informed Lieutenant Fisher, and Lieutenant Fisher interviewed me and I think he was a supporting advocate in helping trying to get rid of her for whatever reason. So he didn't really pursue the information. Went back and told her that I didn't say what I said to her, which created an internal situation that was already there a year before I got there.

I think she went to the deputy warden to my

**51**

knowledge and the deputy warden moved me because he didn't take actions. She felt as though her supervisor, Lieutenant Fisher, didn't do nothing.

I shouldn't have been moved, because all I did is say what was relayed to me. They moved me, took my job, all that. I still can't seem to understand that. So that started that investigation right there. All I did was say this is what I heard, I'm done with it. Whatever y'all do is your call. It is out my soul. I ain't got nothing else to do with it.

I didn't want to be walking around with that on my conscience, knowing someone was trying to set someone else up, trying to use an inmate. I did what I thought was best.

Deputy warden knew about this. I had a conversation with him one day, because someone said that was the deputy warden. I asked, when I go back to the Merit building and get my job back?

He was like, I doubt if you will be going back.

I said why? What did I do wrong?

Well, you won't be going back there. We don't know what we are going to do with you yet.

So after the investigation was over, my

**52**

counselor, she came to me in the PI building, said, well, I got good news, the investigation is over, but the bad news is you can't go back to Merit building. You can't get your job back. You either go to medium into the kitchen or to DCC, Green Tree.

I'm like, why? There's no write-up in my file. All I did was gave an officer some information about another officer trying to set her up. Why I can't go back to Merit building and get my job?

And I didn't go back to Merit building. They classified me up. So when they classified me to medium in the kitchen or DCC, I said I'm not choosing either one of them. So they classified me the way they classified me.

When I got up here, of course, they didn't want -- they didn't really want me up here, because, see, in 1996 they took me down to Georgetown to get me up out of here. So they have been trying to -- I'm sure you have some knowledge of this.

Q. Let's step back. Before you were talking about the investigation. So is it fair to say that you understand you were moved because of the investigation, but you don't understand why you were implicated in the investigation?

**53**

A. I understand I was implicated because I'm the one that said to the officer this is what this inmate told me. If you want to talk to him, that's on you, but I'm out of it. Now, I'm out of it.

I don't know why I was moved.

Q. So you understand why you were involved in the investigation?

A. I have certain knowledge of it.

Q. That's why you were moved out of the Merit building?

A. Right.

Q. Let's go back to when you were asked to make a choice between the kitchen and Green Tree.

A. Right.

Q. Why wouldn't you choose?

A. What policy is that? I didn't do nothing wrong. I was already working as a tutor in James Grove High School when I was in the Merit building. I shouldn't have been moved out of the Merit building. I didn't do nothing wrong, no infractions. I didn't think it was right for me to choose to a lesser, subordinate job or position just because they saying, I can do this.

Q. Okay. So you were stubborn and refused to make a choice?

Page 54

3   I didn't do no wrong to lose that position or my room out
4   of the Merit building.
5       Q.  Apart from this investigation that you were
6   talking about where you said you had some information and
7   you told Corporal Watson, everything that you just
8   discussed, do you remember being asked or spoken to about
14  you see the memo where it discussed how you sat down with
15  the officer to discuss the investigation, that you
16  wouldn't give him any information?
17      A.  What officer?  Do you remember what officer it
18  was?
19      Q.  I'm going to look through the papers now.  Hold
20  on one second.
21      A.  I wasn't prepared to come up here, because I had
22  a law library appointment.  That's why I didn't bring
23  none of my material.  As soon as they called me for 9:30
24  I thought I was going to the law library and then come up

Page 56

3       Q.  Did he interview you as soon as you were moved to
4   ASDA or while you were in PI?  Where were you?
5       A.  PI.  I came out of ASDA.
6       Q.  Did he interview you alone or with anyone else?
7       A.  Attempted to interview me.  He called me in
8   there, I went in there, hit the tape record, stated his
15      Q.  So you never gave him any information beyond that
16  you wouldn't talk to him without your attorney?
17      A.  That's what I was instructed by my attorney.
18      Q.  After that, were you ever sat down to participate
19  in an interview for the investigation?
20      A.  No.
21      Q.  That was the only time?
22      A.  Yes.
23      Q.  Let's go back to Rick Kearney.  We were talking
24  about the warden before.  I was asking you what you feel

Page 55

1   here.
2       Q.  I don't think I brought them with me, but I sent
3   you discovery documents on April 3rd.  Do you remember
4   that?
5       A.  Probably.
6       Q.  Did you get a packet of papers from me?
7       A.  Big package?
8       Q.  That's right.
9       A.  Yeah, I got them.
10      Q.  Have you looked at it at all?
11      A.  The write-up and all that stuff in there?
12      Q.  All the information there, have you looked at it?
13      A.  Yes.  I scanned through it.
14      Q.  Scanned through it.
15      A.  Yes.
16      Q.  There was a memorandum included at the end.  I
17  suppose you don't recall looking at it?
18      A.  Not that I can recall specifics of it, but I
19  looked at it.  I look at everything.
20      Q.  That's fine.
21          Let's see if you recall at all if when you
22  were moved from Merit to ASDA if you recall being
23  interviewed by anyone?
24      A.  Yes.

Page 57

1   he did to racially discriminate against you.  We started
2   talking about the investigation.  Let's talk about what
3   you feel he did to racially discriminate against you.
4       A.  Allowed me to be moved.  Allowed for my job to be
5   taken.
6       Q.  Anything other than that?  We talked about that.
7       A.  Allowed me to be classified up here.
8       Q.  Next let's talk about Mike DeLoy.  Who is Mike
9   DeLoy?
10      A.  Deputy warden, to my knowledge, of SCI
11      Q.  What do you understand his job responsibilities
12  to be?
13      A.  Oversee SCI, DOC policies that run SCI.
14      Q.  Anything else?
15      A.  Act as warden when the warden not there.
16      Q.  Did you ever have conversations with Mike DeLoy?
17      A.  Yes.
18      Q.  Often or --
19      A.  No.  Just that one time.  I was informing you I
20  seen him, I asked him when I was going back to Merit
21  building, when can I start back working.
22      Q.  That was the only time that you spoke with him?
23      A.  Yes.  I don't know him on a regular like that.
24      Q.  How is it that you were able to talk to him that