# EXHIBIT I

Case 1:05-cv-00399-JJF    Document 187-11    Filed 07/20/2007    Page 1 of 6

James Johnson

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES A. WILSON, et al.,       )
                               )
     Plaintiffs,               )   C.A. No. 05-399-JJF
                               )
v.                             )
                               )
STANLEY TAYLOR, et al.,        )
                               )
     Defendant.                )

    Deposition of JAMES JOHNSON taken pursuant to notice before Renee A. Meyers, Certified Realtime Reporter and Notary Public, in the Sussex Correctional Center, Georgetown, Delaware, on Thursday, June 28, 2007, beginning at approximately 12:55 p.m., there being present:

APPEARANCES:

    DEPARTMENT OF JUSTICE
    STACEY XARHOULAKOS, ESQ.
      820 North French Street, 6th Floor
      Wilmington, Delaware  19801
      for Defendants.

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street    Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Page 6

1  A. Yeah.
2  Q. And eliminated some defendants?
3  A. Yeah. It was some defendants signed off.
4  Q. Well, let me just clarify. You are a plaintiff.
5  A. Yeah.
6  Q. And all the other inmates who filed with you,
7  they are plaintiffs.
8  A. Yeah.
9  Q. And the people that you sued, they are the --
10 A. Defendants.
11 Q. They are the defendants, right. So I think what
12 you were talking about are the plaintiffs; is that
13 right?
14 A. Yeah. Some of the plaintiffs signed off.
15 Q. And do you also know that some of the defendants
16 have been dismissed?
17 A. No. I didn't know -- yes. It was -- I think it
18 was two of them. It wasn't -- it wasn't Rick Kearney
19 and it wasn't -- Stolzenbach -- I don't think it was
20 Stolzenbach -- I don't know which ones got dismissed
21 right offhand.
22 Q. You recall the order, you just don't recall who
23 was dismissed?
24 A. There was an order, I think it was two of them

Page 7

1  that dropped off. I think one -- I don't remember
2  seeing no more about Stolzenbach. It might have been
3  Stolzenbach. I am not sure.
4  Q. Do you remember, when this litigation was
5  initiated, how you became involved in it?
6  A. Yes. The dude, Nathan Henry, was going through
7  something with the officer about his job, and the same
8  problem, another inmate was going through about his job
9  but he wasn't moved, Nate was moved. That's how the
10 whole thing came about.
11 Q. Did you initiate it or did someone else?
12 A. James Wilson initiated it, but we all was
13 witnesses to it.
14 Q. You were witnesses to what happened to Mr. Henry?
15 A. As far as being moved out of the building because
16 of his job.
17 Q. And were there any other reasons why the suit was
18 initiated?
19 A. Because it was a long history of Stolzenbach just
20 doing what he wanted to do to anybody. He just didn't
21 care.
22 Q. Did you have your own allegations?
23 A. Against Stolzenbach?
24 Q. Yes.

Page 8

1  A. I never filed any myself on him, but we did have
2  words a few times.
3  Q. Let me clarify my question: When you initiated
4  the suit with Wilson and the other plaintiffs, did you
5  have any of your own allegations of racial
6  discrimination by any officer against you?
7  A. Yes. Quite a few officers.
8  Q. Tell me about those.
9  A. For one, the counselor.
10 Q. Counselor who?
11 A. Miss Furman. I will send you a copy of it.
12 Q. What did she do to you?
13 A. I asked her to put me in for an institution
14 modification, 4217. First she said that I ain't have
15 enough time in. I got over the time I need in. Then
16 she tell me she don't do it. Then I got a record from
17 public notice about three other inmates that she done it
18 for. Then I asked her, Can she get permission for me to
19 write my son, which is in Smyrna. I already had
20 permission to write him but it had to be up-to-date. It
21 took another year for that.
22 Q. 4217?
23 A. Yes.
24 Q. What's that?

Page 9

1  A. Institution modification.
2  Q. And you are saying this was denied?
3  A. Yes. She said -- she was giving me different
4  reasons why she couldn't do it.
5  Q. And what reasons did she give you?
6  A. She said she don't want me to get out and do the
7  same crime again.
8  Q. Any others?
9  A. Yes. She said -- and I said, Well, what about
10 the other two guys that you put in for them? She said,
11 I never put nobody in. So I got a public notice of the
12 dates when she gave it to them, which was 2/12.
13 Q. Do you know who the other guys were?
14 A. Bobby Nichols and Bill Wheaton, William Wheaton.
15 Q. William Wheaton?
16 A. Yeah, and Bobby Nichols.
17 Q. And how does this relate to race?
18 A. Because they was both white guys and I asked her
19 why none of these other guys got this same thing. Then
20 it was another instance with her where I asked her why
21 did these other guys keep switching jobs, all white
22 guys, and then these black guys got jobs.
23 Q. Hold on. We are talking about the 4217 first.
24 A. This is all dealing with 4217.

James Johnson

4 (Pages 10 to 13)

Page 10

1  Q. You said you put in a request and it was denied?
2  A. Yes.
3  Q. And then you said there was other guys you read
4  in the public notice, Nichols and Wheaton, who got it?
5  A. She put in for the modification.
6  Q. For the modifications?
7  A. Yes.
8  Q. And do you know if she has any policies with
9  which she has to work by for the 4217?
10 A. Not that I know of.
11 Q. Do you think it's just completely up to her?
12 A. I mean, in all reality, the way she was saying
13 it, I asked her why I couldn't get it? She said because
14 she don't want me to go out and repeat. What thing is
15 her to say I am going to go out and repeat it. That's
16 not her job. Her job is to put you in for what you ask
17 for, and it's up to the board to deny you of certain
18 things you can't get.
19 Q. How do you know she didn't put it into the Board?
20 A. Because I know she didn't. She told me right
21 then and there, and I had a lieutenant witness, which is
22 Dukes, who just walked past, that she is not going to do
23 it.
24 Q. Do you know if there is any policies about which

Page 11

1  ones can get put to the Board or not?
2  A. No. It's -- the law say that any time a person
3  in a truth and sentencing have half their sentence in,
4  they eligible for it. I am saying, no write-ups,
5  working since I have been here, so I was automatically
6  eligible for it. She told me that, do two more groups
7  and then she will think about it the following year.
8  But -- so, I wrote her back and I explained to her, this
9  was like in September, October, I wrote her back and I
10 said, You said you are going to pull two groups. Right
11 to this day, the groups ain't up yet and I am ready to
12 go back up in front of her again.
13 Q. When did you originally put the 4217?
14 A. When I originally asked for it was October.
15 Q. October when?
16 A. The 16th.
17 Q. What year?
18 A. 2006.
19 Q. Let me try to clarify for you. When the
20 litigation was first initiated, at that time, other than
21 what happened with Nathan Henry, did you feel there was
22 anything that happened with you which necessitated
23 filing a litigation based on discrimination?
24 A. No. But I had seen other people with this

Page 12

1  problem that couldn't read or write.
2  Q. The reason that I am trying to find out what
3  happened to you is because -- do you understand what a
4  class action is?
5  A. Yeah.
6  Q. Do you understand that this case is not a class
7  action? Did you know that?
8  A. Why it's not a class action?
9  Q. What do you think a class action is?
10 A. More than one person.
11 Q. And do you understand that to have a class
12 action, it has to be approved by the Court?
13 A. Yeah.
14 Q. And that there --
15 A. To go further with the proceedings.
16 Q. To be classified as a class action, the Court has
17 to call it that; do you understand that?
18 A. No. I don't understand that.
19 Q. Do you know that a class action has to have a
20 representative of the group?
21 A. Yes, which is James Wilson.
22 Q. So, were you under the impression that he was the
23 representative?
24 A. For the group.

Page 13

1  Q. The Court issued an order where they said that
2  it's not a class action because one inmate can't act as
3  a representative for a group of inmates.
4     Do you recall reading that order?
5  A. Yes. But they had -- they were trying to turn it
6  down because of that but it went further on after that.
7  Q. The litigation continued, but do you understand
8  that it continued but not as a class action?
9  A. So what is it now, then, if not a class action?
10 Q. It's each plaintiff has their own case against
11 the defendants.
12 A. Okay.
13 Q. But for simplicity purposes and to help the
14 Court, they keep it under one case, but because it's not
15 a class action, each plaintiff has his own case.
16 A. Okay.
17 Q. Until such time that there is a representative or
18 the Court calls it a class action.
19 A. Okay.
20 Q. So does that make sense to you?
21 A. Yes. That's why everybody was trying to pitch in
22 and get a lawyer. Everybody was trying to pitch in and
23 get a lawyer before it's over.
24 Q. If you were able to find a representative and you

James Johnson

5 (Pages 14 to 17)

Page 14

1  applied to the Court again, they might -- I don't know
2  what the Court would do at this point in the litigation,
3  I don't know. But right now, it's not a class action.
4      A. Okay.
5      Q. So that's why I was asking what specifically has
6  happened to you.
7      A. Okay.
8      Q. Do you know who the remaining defendants are in
9  the case? Did we talk about this already? I don't
10 remember. You said you can't recall.
11     A. I got all of them on paper, who they are.
12     Q. Do you understand that the Court dismissed
13 everyone but Stan Taylor and Rick Kearney?
14     A. Okay. Stan Taylor and Rick Kearney, the warden.
15     Q. That's right.
16     A. Yes.
17     Q. And that Mr. Wilson has a retaliation claim
18 against Mike Deloy.
19     A. Okay.
20     Q. But the rest of the plaintiffs have their claims
21 against Stan Taylor and Rick Kearney.
22     A. Okay.
23     Q. Do you understand that?
24     A. Yes.

Page 15

1      Q. Do you understand what Rick Kearney, when he was
2  the warden here, what his responsibilities included?
3      A. Yeah, tell the deputy warden what to do.
4      Q. Anything else?
5      A. Walking around and see what people's complaints
6  is and never answering them.
7      Q. And did you make any direct complaints to him?
8      A. Yes, I did.
9      Q. When and what?
10     A. October the 16th of 2006.
11     Q. What was that complaint?
12     A. On Miss Furman.
13     Q. And this was about the 4217?
14     A. Yes. Then I made another one which was almost a
15 month and a half ago against two other officers.
16     Q. Did you make that complaint a month and a half
17 ago to --
18     A. Rick -- no. I made it to Mike Deloy. He never
19 answered it.
20     Q. Other than the 4217 to Rick Kearney, did you make
21 any other complaints to him directly?
22     A. No. That's the only one. Yeah, him and Deloy --
23 that's the only one.
24     Q. And how about Stan Taylor?

Page 16

1      A. No. I sent a copy to that Danny dude, the new
2  deputy warden -- I mean the new commissioner. I sent
3  him a copy of it.
4      Q. Why do you think that Rick Kearney violated your
5  civil rights with regard to this action?
6      A. Because he never answered every time we wrote him
7  about different stuff. He never even answered the
8  letters back or nothing.
9      Q. Do you understand what the claims are in this
10 action?
11     A. Yeah, like a racist. It's more like racist.
12     Q. Right. So, with regard to Rick Kearney, how did
13 he racially discriminate against you?
14     A. Because when we filed a grievance on this
15 officer, he never came down to see what the problem was
16 or nothing. It's just like it never happened.
17     Q. When did you file this grievance?
18     A. Right around the time we started the whole
19 lawsuit, period. Almost -- almost two years ago.
20     Q. And did --
21     A. It might be a little longer than that.
22     Q. Did this officer discriminate against you or are
23 you talking about the Henry issue?
24     A. The Henry issue.

Page 17

1      Q. And how do you think Stan Taylor racially
2  discriminated against you?
3      A. How do I think Stan Taylor did? Because he is
4  over top of the warden and he never had his officer
5  answer us.
6      Q. Do you think that's part of his job?
7      A. Part of his job is if the building caught on
8  fire, to get everybody out.
9      Q. You think that's Stan Taylor's job?
10     A. It's part of his officer's job. If his officer
11 don't do it, he is supposed to do it if the building is
12 on fire.
13     Q. Do you think that correctional officers report to
14 the commissioner for every single decision?
15     A. No. They report to the warden and the -- their
16 union representative.
17     Q. In the complaint, there was an allegation that --
18 I will read it to you -- "Stan Taylor, the Commissioner,
19 and Warden Rick Kearney maintained policies that denied
20 black inmates equal protection."
21         Do you know what policies they are referring to?
22     A. Not unless you are talking about as far as the
23 job prescriptions, like --
24     Q. The job descriptions?

Page 18

1   A. It could be like that, like the maintenance jobs
2   or stuff like that.
3   Q. But do you know specifically -- it says, A policy
4   that denies black inmates equal protection.
5       Do you know what policy they are referring to?
6   A. No, I don't.
7   Q. What I am asking all the plaintiffs in the case
8   is, as knowing where it stands, with Stan Taylor and
9   Rick Kearney being the only remaining defendants and the
10  only allegations would be the equal protection and
11  racial discrimination allegations, whether you still
12  wish to participate in the lawsuit at this point?
13  A. Yeah. I still want to participate.
14  Q. Did you receive my discovery that I sent to you?
15  A. About being here today?
16  Q. No. There were questions, interrogatories and
17  requests for production.
18  A. Yeah. We had sent -- the one we sent back to
19  you?
20  Q. Did you send them back to me?
21  A. Yes, I did, the 27th.
22  Q. In the interrogatories, I asked you to provide
23  more detail of the allegations in the complaint, and you
24  just said you agree with all of them.

Page 19

1   A. Yeah. The ones that James Wilson -- about the
2   Nathan Henry, yeah, about why he moved the man and why
3   other people wasn't moved and certain things that
4   happened to him.
5   Q. Are you able to elaborate on the complaint at
6   all, provide more detail?
7   A. About the incident?
8   Q. About the allegations in the complaint?
9   A. Yes. The guy was supposed to scrub the shower,
10  the black guy was supposed to scrub the shower. We got
11  two tier men, a black one and white one. The black guy
12  is supposed to scrub the shower. He done scrubbed it.
13  The other guy done scrubbed it. So somebody tell on
14  him. So he come over, and he didn't even look to see if
15  he scrubbed him. He just fired him. But when he goes
16  upstairs, he didn't fire the other guy, and then he
17  moves the guys out of the building.
18  Q. Who is he?
19  A. Stolzenbach. That's the one who the original
20  complaint was on.
21  Q. Do you understand that he is not in the case
22  anymore?
23  A. Yes. I don't know how because the complaint was
24  on him so I guess the warden is going to take his place.

Page 20

1   Q. The warden was originally in the complaint also;
2   do you understand that?
3   A. Yeah. It was the warden -- it was supposed to be
4   the people that run the institution, warden, deputy
5   warden, and Stolzenbach and another officer, I think it
6   was.
7   Q. You said, in your responses to the
8   interrogatories, that you wrote letters?
9   A. Yes.
10  Q. To Rick Kearney?
11  A. Yes.
12  Q. And I asked you to give me copies of those
13  letters. Do you have copies?
14  A. I sent you a copy of one of the letters I sent to
15  him.
16  Q. You sent me a copy?
17  A. Yes, I did, the 27th. Your name is Stacey and
18  your last name starts with an X?
19  Q. That's right.
20  A. I sent you a copy.
21  Q. I have your responses here and there is no copy
22  of the letter in there. Do you have it with you?
23  A. I was just looking for my date.
24  Q. Let me check again. Here is a copy of it right

Page 21

1   here. Did you write this letter?
2   A. Yes, I did.
3   Q. And there isn't a date on it.
4       Do you have a dated copy?
5   A. Probably ones I sent out.
6   Q. Do you have any recollection what the date was?
7   Can you recall?
8   A. It was sometime in October. It was around
9   October when I sent that out.
10  Q. This past year?
11  A. No.
12  Q. 2006?
13  A. Yes.
14  Q. Did you write any letters before the filing of
15  the complaint?
16  A. Before the filing of the complaint? Against
17  Stolzenbach?
18  Q. No. The filing of the complaint in this case --
19  A. No.
20  Q. -- which named multiple defendants?
21  A. No.
22  Q. What injury are you alleging you suffered?
23  A. On this injury?
24  Q. What injury?