# EXHIBIT M

Roderick T. Brown

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES A. WILSON, et al.,      )
                              )
     Plaintiffs,              )  C.A. No. 05-399-JJF
                              )
v.                            )
                              )
STANLEY TAYLOR, et al.,       )
                              )
     Defendant.               )

Deposition of RODERICK T. BROWN taken pursuant to notice before Renee A. Meyers, Certified Realtime Reporter and Notary Public, in the Sussex Correctional Center, Georgetown, Delaware, on Thursday, June 28, 2007, beginning at approximately 10:15 a.m., there being present:

APPEARANCES:

    DEPARTMENT OF JUSTICE
    STACEY XARHOULAKOS, ESQ.
      820 North French Street, 6th Floor
      Wilmington, Delaware  19801
      for Defendants.

CORBETT & WILCOX
Registered Professional Reporters
230 North Market Street     Wilmington, DE 19899
(302) 571-0510
www.corbettreporting.com
Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

Roderick T. Brown

5 (Pages 14 to 17)

Page 14

1  Kearney discriminated against you because those are the
2  remaining defendants?
3      A. I just feel that -- well, it runs up the chain,
4  but, basically, we don't have no dealing with him, with
5  neither three of them because they are out here, so it
6  usually starts with the counselors.
7      I just feel that it is discrimination as far as
8  the jobs, how you are treated, as far as the points
9  system and how sometime the point system helps some
10 people and some people that it don't. It affects you.
11     My thinking, if you qualify for a job or whatever
12 or you had the knowledge, whatever, no matter if you are
13 green or yellow, you should get that job. It shouldn't
14 be no top priority. Or if your points is low, you fit
15 that criteria, you should get that. Don't bend and
16 break the rules for certain people to benefit and don't
17 use the point system to hold certain people back just
18 for -- I had an incident where I finished the Key
19 program and I only had four points.
20     I understand I still have time to do, I am not
21 looking to get out of jail, but why would you send me
22 backwards -- after finishing the program, you send me
23 right back to where I started from when I first came to
24 jail, to medium building, with only four points. You

Page 15

1  take my job from me. You take my job from me, send me
2  over to medium building with no write-ups, no nothing,
3  then you sit me there and have me wait three or four
4  months for housing to get back to Merit building. You
5  see what I am saying?
6      It's like you are going backwards. When some
7  people, boom, you just go -- you go back to Merit where
8  you was or you go back to minimum. I feel like three or
9  four of us, and it wasn't even a color thing with that
10 because it was two black guys and a white guy, we all
11 went backwards.
12     I mean, I am not looking for no points or nothing
13 because I shouldn't be in jail, but my thing is if you
14 are striving to do what's right, why are you sending me
15 backwards so you are making me fight -- do you see what
16 I am saying? I do two steps right and then you bring me
17 back here instead of when you should have put me there
18 from the beginning.
19     So I had to go through a whole cycle to get back
20 to Merit building, which I seen some people that finish
21 the program went straight back to Merit.
22     Do you see what I am saying?
23     Q. So why do you think that is, if it wasn't a color
24 thing? What do you think the reason was?

Page 16

1      A. I honestly feel that it is, but at the same time,
2  we all not dumb. You put one white guy in the mix of it
3  so you can't say that it's racial or whatever.
4      Q. So you think that it was discrimination even
5  though a white guy was in the same situation?
6      A. Yeah.
7      Q. Why?
8      A. Why do I feel that it was discrimination?
9      Q. Yes.
10     A. Because why some of us that we are going to
11 complete the program, you make us do the program, you
12 don't complete it, you get points and you go backwards,
13 but I am saying, If we are going by your rules and
14 playing by your game and we complete it, why go
15 backwards?
16     Q. I guess what I am looking for from you is
17 something concrete. You know, I'd like for you to give
18 me names or specifics examples so that it's clear what
19 the allegation is.
20     I mean, you say you were unfairly treated because
21 of your race. I would like you to tell me why you think
22 it was because of your race and who was treated
23 differently from you that was not of your race?
24     A. I seen it all the time. I don't know because I

Page 17

1  don't talk to most of these guys. I don't know their
2  name. But I seen specifically, sticking to me, with me,
3  Javar, Roderick Brown, Javar James and Andrew -- I can't
4  think of his last name -- David Andrews, we all
5  completed the Key program. We all had jobs after we got
6  out the Key program, waiting for housing. So you take
7  our jobs from us and send us over to medium building.
8      Q. Are all of these individuals black?
9      A. No. David Andrews is white.
10     Q. He is white. Okay. And the other three are
11 black?
12     A. Yes.
13     Q. And you completed your job -- you completed Key
14 and you had jobs?
15     A. Right. After we got out the key, we had jobs.
16 You take us from our jobs with no explanation and move
17 us to medium building, which is going backwards. So
18 that means you took our jobs from us, sat us in medium
19 building. Then, from there, it was nothing said. We
20 asked why were we going to medium? It was basically,
21 Don't ask no questions; you are being here for housing,
22 basically.
23     So I feel that, yeah, you being punished.
24 Instead of moving on in the circle or the way you should

Roderick T. Brown

6 (Pages 18 to 21)

Page 18

1  be, so that means I left Merit and had to be -- go all
2  the way around in a circle to get back to me.
3     Q. Why do you think you have any right to be moved
4  in a different way?
5     A. Why? Because I am looking at your book and the
6  way you said that things should be done and that's the
7  way it should be done.
8     Q. Is there a policy that you are saying wasn't
9  followed, something that you can point to that's
10 written?
11    A. The point system, if you -- if you are under that
12 point system, you are using the point system that they
13 give us here. With four points, there is no way they
14 should move you back to medium. Medium is usually from
15 eight points on up to 14 or whatever. 16, you go to
16 maximum security. So my thing, anything from one to
17 seven points, you are supposed to be to Merit or
18 minimum.
19    Q. Have you ever asked why you were being moved into
20 that area?
21    A. Yes, several times. I was never given any answer
22 from the counselor or whatever. When I got over there,
23 I asked the counselor.
24    Q. Who is that?

Page 19

1     A. Mr. Dil, I had asked him, and he had no idea. I
2  guess I was just on his case load now. The only thing
3  he told me to do is be patient and that I was going to
4  move. And I end up moving before my next
5  classification, which is this month.
6     Q. Has anyone ever told you you were being treated
7  differently because of your race?
8     A. Nobody don't have to tell you. You see these
9  things.
10    Q. So, other than from what you saw and observed, is
11 there anything else, you know, something you heard, some
12 written policy, any other evidence of this?
13    A. Listen, miss, you don't understand because you
14 are not here. The policy and everything is subject to
15 change. They use it the way they want to use it to fit
16 what they want to fit. Right now, you don't understand
17 because you are not locked up. You don't have no,
18 really no say so.
19    Q. So if you had to put this case in front of a jury
20 and a trial, what would you do to prove your
21 discrimination? Because that's what you would have to
22 do.
23    A. I would pull out their point system and
24 everything that they said this is the guideline that

Page 20

1  they are going by and see -- and let them see how the
2  guideline they give you, they don't follow is as is.
3  They change the rules as they go along.
4     Q. I understand what you are saying about the point
5  system and how it's not followed, but how would you
6  relate that to a race issue?
7     A. A race issue? Because you -- if you are here,
8  you see mostly all the white guys, they get all the good
9  jobs. Even if you are qualified.
10    Q. Who?
11    A. I don't know these people names, miss. These are
12 regular inmates. You see these things. You apply for
13 these jobs. You have the knowledge for these jobs. You
14 have the skills for these jobs. Your points is right or
15 whatever, but it's always, No, or, You have been denied,
16 or very seldom you get what you asked for.
17    Q. Were you denied a job because of your race?
18    A. Yeah. I believe so. The Tempo job one time.
19    Q. Tempo job. When was this?
20    A. This was back in, like, 2005, right back in the
21 Merit building.
22    Q. Is this something that you have to apply for?
23 How does it work? You just say you are interested?
24    A. You interview for Miss Fuhrman or whatever, you

Page 21

1  are interviewed, and you feel, I guess because she is
2  the -- she is in charge of that and I guess she feels
3  what's going on or whatever.
4     Q. And did you just not get that job or did you get
5  a different job? What happened?
6     A. I didn't get that job. They sent me to the
7  kitchen.
8     Q. Were you told why you didn't get the job?
9     A. No. They didn't -- they just gave me the run
10 around, but back then, when we went to the kitchen, it
11 was predominantly all black workers in the kitchen.
12       See, it's not the point of the job or whatever to
13 me, but my thing is I am -- the way I am -- you want me
14 to wash your dishes for 18 cents, I still got the
15 knowledge, even though I am in here for selling drugs, I
16 still have the knowledge to teach people from not
17 selling drugs. That's what Tempo is about, to make
18 wiser choices, to learn from your mistakes. But, at the
19 same time, I feel that that just means a few of us
20 that's in there for that, who else is a better candidate
21 that has experience in this for the younger guys that
22 come in from jail instead of having them make the same
23 mistakes.
24    Q. Do you know who got that Tempo job that you

Page 22

1 applied for?
2    A. Not right offhand. I didn't -- I don't know who
3 got it right offhand, so I don't want to lie to you.
4    Q. And I am not trying to be obscure or to trip you
5 up, but this is what I am looking for. I asked for a
6 concrete example, how you think you were discriminated
7 against, and you pointed to this job you think you were
8 denied. So, on that vein, are there any other things,
9 any other circumstances in the prison where you think
10 you were discriminated against?
11    A. Even on my classification, I felt that I was
12 discriminated on after I finished the Key. Then when I
13 was denied minimum and they sent me -- that's when they
14 gave me Merit. Now, my thing was she told me that --
15 she said, You had escape third on your record. My thing
16 was, Okay, that's a misdemeanor. That's not even a
17 felony, so why would that stop you from putting me over
18 at minimum.
19    Q. Were you told that that's why?
20    A. Yes. I was told that from Pat Ditto that these
21 are the things that, you buck against these things, you
22 are subject to be moved to another prison, or, boom,
23 there is no need to fight with these people because my
24 mission is to get out of jail. But at the same time, I

Page 23

1 am not just going to let you run over top of me and tell
2 me one thing and I see you do another.
3    Q. Did Miss Ditto tell you that the escape third
4 charge, even though you said it was a misdemeanor
5 charge, were you told that that kept you from being
6 classified?
7    A. To minimum.
8    Q. To minimum?
9    A. Yes. She told me if I was to escape or whatever,
10 that would be on her. I am saying to myself, That's a
11 misdemeanor. And I even explained to her, That's not a
12 felony charge; it's a misdemeanor. She said, It doesn't
13 matter.
14    Q. Do you think that classification, just talking
15 about that, do you understand that there is written
16 policies as to classification?
17    A. Mm-hmm.
18    Q. Do you think she has any control over how she
19 puts those policies forth?
20    A. Yes. Because she is -- she makes the decisions,
21 not her as an individual, but she has a nice influence
22 on it because, like I told you, this is not hearsay, I
23 asked her and she told me to my face, You have escape
24 third on your record, and I told her that that's a

Page 24

1 misdemeanor. I said, It's not a felony or whatever. I
2 said, That's like unaccountable time. I said -- I said,
3 Plus, it's been over five years. She said, It doesn't
4 matter.
5    Q. Now, why do you think that that classification
6 was discriminatory?
7    A. Because I am pretty sure and I done seen other
8 people with escapes on their record that's over minimum.
9    Q. Who is that?
10    A. I keep telling you, I don't know these people
11 names. When you are in prison, miss, you don't --
12 that's like you have people work next door to you, you
13 don't know their name or you have people work in your
14 office, you know of them, but you don't -- not being
15 funny, you don't associate with them.
16    Q. So you think --
17    A. You see things.
18    Q. You think there are other people who have escape
19 who have been classified to minimum, and what race were
20 these people?
21    A. Not just white, different ones, even blacks.
22    Q. So there is unequal treatment based on what?
23    A. The point system and the way they do things,
24 period.

Page 25

1    Q. I am going to go back to the defendants in this
2 case, and that's Rick Kearney and Stan Taylor. I know,
3 before, you said it's like a chain, and I'd just like to
4 know what you think they didn't do or should have done
5 or what -- what control did they have over something
6 that you think was discriminatory?
7    A. You are talking about Rick and them?
8    Q. Warden Rick Kearney and former Commissioner Stan
9 Taylor.
10    A. I can't tell you that. Like I said, I have no
11 contact. Like I said, it's a chain of command. We
12 don't even see them. I am sure some things, to give
13 them the benefit of the doubt, that they are not even
14 aware because they have bigger things to deal with.
15    Q. I understand what you are saying because it's a
16 chain of command and these are people --
17    A. Some things they are probably not even aware of
18 because that's why you have -- that's like you have a
19 corporal, a sergeant, a lieutenant, and general. It's
20 like in the Army, some things you don't -- you are not
21 aware of until it does reach to the tippy top because
22 you have these people and position that's qualified that
23 are supposed to handle this before it even gets up to
24 that far. Do you see what I am saying?

### Page 26

1  Q. I do understand what you are saying, but those
2  are the two defendants left in the case, so we really
3  need to be able to put into words what you think each
4  individual plaintiff may have done that was
5  discriminatory because the other defendants are no
6  longer in the case.
7  A. Well, my thing is I don't think that the due
8  process and all the rules are being followed by the
9  classification, and I am pretty sure they have the last
10 say so whether you are moved to work release, whether
11 you move building work, whether you remain, or whether
12 you be moved out of the prison or whatever. And I am
13 pretty sure, like, because of this, who knows, once you
14 all get in touch with them, they could say, Pack your
15 bags, you are moving to Smyrna, or you are moving to
16 Gander Hill, with no explanation; do you understand?
17    So there is always a chance of being retaliated
18 against in their own little way. Just having this
19 interview with you, you don't think they know you are
20 here? Of course.
21  Q. Well, this isn't an interview. I am their
22 attorney, so, of course they know I am here, yes. Of
23 course.
24  A. You are their attorney?

### Page 27

1  Q. That's right. Have you ever met Stan or Rick --
2  Rick Kearney or Stan Taylor?
3  A. Briefly.
4  Q. Both or one?
5  A. Both.
6  Q. And what context was that?
7  A. A couple of times, they walked through or come on
8  the tier, whatever.
9  Q. Did they speak to you?
10 A. They are friendly. They are doing their job.
11 It's nothing personal.
12 Q. Did they speak to you personally or just, Hi, how
13 are you, that kind of thing?
14 A. Just in general, Hi, or, Do you have a question?
15 They are very well mannered. I won't lie on them.
16 Q. Did you ever have a question for them or
17 anything, have a conversation?
18 A. No. I just keep it moving.
19 Q. Before the action was filed, the civil complaint,
20 did you file any grievances alleging racial
21 discrimination?
22 A. No. I told you over and over, the grievance
23 things is a waste of time.
24 Q. Tell me -- actually, what I am going to do is

### Page 28

1  just go to the complaint because there is specific
2  allegations in there and I just want to ask you about
3  them. The Merit building, there is two sides to it; is
4  that right?
5  A. Yes.
6  Q. Tell me about the two sides.
7  A. What do you want to know? As far as what? It
8  basically ran the same way.
9  Q. They are?
10 A. Yeah. It's one building.
11 Q. And what are the two sides?
12 A. You got east and the west side.
13 Q. Is there any difference between the two?
14 A. No. The only thing the west side got more
15 laundry workers.
16 Q. Do you know if there is any reason for that?
17 A. No, not really. I believe they just put them all
18 on one side so they all can get up and leave at the same
19 time instead of, which makes sense because you wouldn't
20 want three on the east side and you got a guard, are you
21 ready.
22 Q. So they all work the same time, in the laundry?
23 A. Yeah. So that would be crazy to put them
24 separate.

### Page 29

1  Q. Where were you housed when you were in Merit
2  building?
3  A. I was housed on the east. Now I am on the west.
4  Q. You are in Merit now?
5  A. Yes.
6  Q. And you said before, when you were on the east
7  side, you worked in the kitchen?
8  A. Yes.
9  Q. The kitchen is no longer a Merit building job; is
10 that right?
11 A. Yes.
12 Q. It is?
13 A. No.
14 Q. It's not?
15 A. It's not.
16 Q. And where are you working now?
17 A. Right now, I am going to vo-tech and I am waiting
18 on a classification now.
19 Q. What's the vo-tech for?
20 A. Vo-tech, you learn a skill as far as masonry,
21 carpentry. You get enough hours, I guess you get
22 apprenticeship or whatever. Basically give you a trade.
23 Q. And how long is that program?
24 A. It depends on -- usually the first opportunity

Page 30

1  they give you, like, is four months of -- yeah, four
2  months, but if you go or you really pursue it, I guess,
3  you can actually teach it for extended time, I guess.
4      To me, vo-tech is a privilege, so it's up to you
5  to do what you got to do in there. That's just my
6  opinion.
7      Q. Okay.
8      A. I think it's good.
9      Q. And do you know -- you might not know this -- but
10 do you stay, after you finish the vo-tech program, will
11 you stay on the west side of Merit?
12     A. Yes. That's like extra activity. It's -- it's
13 educational. The only way I would even move from the
14 Merit building unless I got in trouble or I was moved to
15 another prison, whatever, my classification changed.
16     Q. And when this suit was filed, you were on the
17 east side at that time?
18     A. Yes.
19     Q. Do you have a preference for either side, where
20 you are housed? I mean, if you could choose, would you
21 choose one over the other?
22     A. No. Not really. Because everybody is treated
23 equally as far as you get the yard, you eat the same.
24 There is really no difference. It's one building. It's

Page 31

1  just separate sides.
2      Q. The complaint specifically against -- I am going
3  to read the part against Stan Taylor and Warden Rick
4  Kearney -- "They maintain policies that denies black
5  inmates equal protection and due process classification
6  and job opportunity."
7      My question to you is: Do you know what policies
8  are referred to --
9      A. I just explained it to you as far as the point
10 system, as far as qualifying for the job. The same
11 things we just went over.
12     Q. The things we discussed already?
13     A. Yes.
14     Q. Do you --
15     A. That's why I was saying I don't think that it is
16 -- a few minutes ago, did you hear me when I said I
17 don't think it's personal from them, from Rick or Stan
18 about -- because, like I said, chain of command, some
19 things they might not even be aware of. And every
20 individual case, to be honest, come on now, every case,
21 everybody can feel, whether you are purple or green,
22 that you are being discriminated because something don't
23 go your way.
24     Q. Right.

Page 32

1      A. But when you see a problem that's occurring over
2  and over and over to certain people and not just you,
3  you feel -- you feel that's being discriminated. Just
4  like some white clients could come in here, Caucasian
5  could come in here and say that they feel that they are
6  being discriminated. So I am not trying to get pity
7  because I am African-American. Do you understand what I
8  am saying?
9      I am just saying, As an individual, are you being
10 treated and getting your fair due process? That's my
11 whole -- that's my whole issue. I can't speak for
12 nobody else.
13     Q. So, I mean, you are characterizing it to me on a
14 more individual level rather than a race level?
15     A. It is racial. You see the racial barrier. You
16 see the numbers and the statistics show that it's harder
17 for African-Americans to get these certain jobs and they
18 always get the shitty jobs, the low totem jobs.
19     Q. Now, are we talking about statistics -- are we
20 talking about now generally or in the prison?
21     A. I am talking about as far as the prison now. I
22 am talking about inside the walls.
23     Q. Now, tell me about these statistics. Where are
24 they?

Page 33

1      A. You -- it's not written down. You don't -- you
2  see these things because you live here. This is your
3  community for now. This is like being in the village
4  where everybody is fishing, and there is -- basically,
5  you got the workers that's pulling in the fish and you
6  got the workers that's stand on the ship but you got the
7  workers that's standing in the water that's pulling the
8  fish up, basically.
9      Q. So you do think that there are many things that
10 do not make their way up to Stan Taylor and Rick
11 Kearney?
12     A. Sure.
13     Q. And you do understand that there are thousands of
14 inmates in the state prison system?
15     A. Sure.
16     Q. What are you currently incarcerated for?
17     A. What am I here for?
18     Q. Yes.
19     A. Drugs.
20     Q. When were those charges?
21     A. 2002.
22     Q. And what was your sentence?
23     A. 19 years, ten suspended after doing the Key, plus
24 a special completion of the Key, I have to do the Crest

Roderick T. Brown

10 (Pages 34 to 37)

Page 34

1  following. Regardless of what goes on now, I will be
2  out of here in 2010.
3      Q. 2010?
4      A. If not earlier, as far as building work or work
5  release, whatever. So, right now, I am on the downside
6  now of my incarceration.
7      Q. Do you have somewhere to go when you get out?
8      A. Yes.
9      Q. Where is that?
10     A. I got a few choices. I got to -- I have a few
11 choices. I got to narrow down what's best for me to
12 succeed. It's not about getting out of jail. It's
13 staying out this time because, eventually, I am going to
14 get out.
15     Q. And your escape charge, that was in 2001; is that
16 right?
17     A. Mm-hmm.
18     Q. Were you told that after a certain amount of
19 years, that that wouldn't interfere with your
20 classifications?
21     A. Yes. I was told that after a certain amount of
22 years, it's not held against you or whatever.
23     Q. Did they say how many?
24     A. I was told five.

Page 35

1      Q. So do you think, at your next classification, it
2  would not be included?
3      A. I can't say that again because I know, like I
4  said, a couple of black guys, Eldon Potts and Joseph,
5  they escapes were past that limit and then they was told
6  ten years, so I don't know. Like I said, the policy
7  changes to their advantage, whatever they want to do.
8  They can use it against you if they want or they don't
9  have to. That's my opinion, how I see it.
10     Q. Were the other two gentlemen, were those escape
11 third also?
12     A. I don't have no idea. But as far as myself, I
13 know mine is escape third. It should be on my record.
14     Q. And your drug charges were how many felonies? Do
15 you remember how many you were charged with?
16     A. I don't want to lie to you. I don't remember.
17     Q. I think we are done. Let me just make sure I
18 covered everything.
19        What injury are you alleging? How were you
20 harmed by the allegations that have been entered in the
21 complaint?
22     A. I am affected mentally, mostly mentally by this
23 because you see these things, they are still going on
24 around you, and this is the 20th Century and it's still

Page 36

1  going on, discrimination, segregation, and everything.
2  You see it still.
3      Q. Have you received any treatment for your mental
4  injury?
5      A. No.
6      Q. Or requested any?
7      A. No. Why should I sit down and have somebody
8  insult my intelligence even more than something I know
9  that's not going to change or something I know right,
10 then you send somebody in here to try to tell me
11 different.
12     Q. And then my last question is: I sent you
13 discovery questions, they were called interrogatories.
14        Do you recall receiving that?
15     A. If you sent it, I am pretty sure I got it. I
16 have to go back and look at my papers.
17     Q. You were supposed to answer those and send them
18 back and you did not. I am just wondering why that is.
19     A. Oh, yes, I did. I did sign them and send them
20 off.
21     Q. You are saying you did?
22     A. Yes, I remember. As a matter of fact, I got --
23 about two months ago; right? I mailed them. Yeah. I
24 know which ones you are talking about.

Page 37

1      Q. Did you send them to me?
2      A. I send them to Wilmington and somewhere else. I
3  got all the information down, but I sent them off.
4      Q. Was it for this case?
5      A. Yes.
6      Q. Do you have litigation in another case right now?
7      A. Yes.
8      Q. Do you know what case that is?
9      A. It's about the kitchen.
10     Q. Do you think that you did it for that case and
11 maybe not mine or did you do it for both?
12     A. I don't know right offhand. I will have to go
13 back and look.
14     Q. Do you recall doing them twice or just once or
15 you just don't recall?
16     A. I don't recall. I don't want to tell you
17 something to contradict myself. I don't know right
18 offhand.
19     Q. Because I did not receive any responses from you,
20 so I am just wondering if they were even sent or what
21 happened?
22     A. Usually -- I don't know why you didn't get it.
23 Usually when it comes to my law work, I am on top of it.
24     Q. You can, if you feel that there is something that