# EXHIBIT Q (con't)



Not Reported in F.Supp.2d                                                                                                Page 1

Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Fatir v. Dowdy
D.Del.,2002.
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Amir FATIR, Plaintiff,
v.
David DOWDY, Patrick Ryan, Barry Hawlk,
Lawrence McGuigan, Robert Snyder, Carl Danberg,
Stanley Taylor, and Colleen T. Schotzberger,
Defendants.
No. Civ.A. 95-677-GMS.

Sept. 4, 2002.

*MEMORANDUM AND ORDER*
SLEET, J.

I. INTRODUCTION

*1 On April 6, 1995, Amir Fatir, a prisoner, filed a complaint against the defendants pursuant to 42 U.S.C. § 1983. His allegations stem from various actions taken by the defendants, all employees of the Delaware Correctional Center ("DCC") in Smyrna, Delaware. At the time he filed his complaint, Fatir was proceeding *pro se.* Among other things, Fatir's original complaint ("the 1995 complaint") alleged that certain of the defendants had tampered with his mail and had taken property belonging to him from his work area.

In May 1996, Fatir wrote the court expressing his concern that the defendants had begun to retaliate against him for filing this lawsuit. This letter added further facts supporting the claims previously filed in the original complaint. Although Fatir stated that the letter was a motion for a preliminary injunction and did not attach an amended complaint, The Honorable Roderick R. McKelvie *sua sponte* decided to treat the letter as a motion to amend. Judge McKelvie granted the motion.

In the summer of 1996, Fatir was transferred to an Arizona prison. In January 1997, he sought to amend his complaint to add claims of retaliatory transfer and retaliation for speech protected under the First Amendment. Apparently, Fatir did not file any grievances with prison authorities regarding these claims prior to amending his complaint.

The case was eventually reassigned to this court. After the case was reassigned, Fatir filed a second motion for appointment of counsel. Although Fatir demonstrated that he was quite capable of prosecuting his lawsuit *pro se,* given the problems he encountered during the discovery period and the practical difficulties presented by his transfer to Arizona, the court appointed counsel on June 20, 2000 (D.I.57). In November 2000, Fatir, by and through his counsel, filed a motion to amend his complaint. On January 29, 2001, the court granted this motion with the provision that the defendants would be permitted to retain any and all applicable defenses. After the third motion to amend was granted, the court entered a scheduling order which set the dispositive motion deadline at November 16, 2001.

Presently before the court are two motions. The first is the defendants' motion for summary judgment filed on November 16, 2001. In this motion, the defendants raise several defenses to the plaintiff's claims, including the plaintiff's failure to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e. In the plaintiff's response to that motion, filed on February 15, 2002, he asserts that since his complaint was filed after the PLRA was enacted, his claims are not subject to any exhaustion requirements. The defendants respond that although this is true for the claims contained in the 1995 complaint, the new claims presented in Fatir's first, second, and third amended complaints were filed after the PLRA's enactment and are therefore subject to its exhaustion requirements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 2
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*2 The second motion before the court is the plaintiff's motion for leave to file a fourth amended complaint. This motion was filed on February 19, 2002, four days after the plaintiff's response to the defendants' motion for summary judgment. The proposed fourth amended complaint will amend Count Eight of the third amended complaint-which currently states a claim for deprivation of property-to state a claim for conversion. The defendants allege that this motion is the product of undue delay and will result in prejudice to their ability to defend this case. Additionally, the defendants allege that the proposed conversion claim is futile. The plaintiff responds that the amendment is not futile, and that the motion is not the result of undue delay.

Upon review of the lengthy record, the submissions of the parties, and the applicable law, the court reaches the following conclusions. First, the motion to amend will be denied. The court finds the fact that the motion was filed four days after the plaintiff's response to the motion for summary judgment supports a finding that the motion is the product of undue delay. For this reason, the court also finds that granting the motion will unreasonably prejudice the defendants and the court. Second, with regard to summary judgment, the court finds that certain of the plaintiff's claims either did not require exhaustion or were properly exhausted. The court finds, however, that there is scant evidence of exhaustion of the claims in Counts Four and Eight. Therefore, the court will order that those particular claims must be dismissed without prejudice until such time as the plaintiff has exhausted his administrative remedies regarding these claims. While the plaintiff is exhausting his remedies pertaining to these claims, this case will be stayed with respect to all other claims. Since the court is staying the case, the court will not decide the other legal issues in this case until the plaintiff has exhausted his remedies. The court will now more fully explain the reasons for is ruling.

II. FACTS [FN1]

FN1. As indicated above, the court will not address the legal merits of the plaintiff's claims at this time. Thus, the court will only provide those facts that are pertinent to the motion to amend and the exhaustion issue raised in the motion for summary judgment.

In 1975, Amir Fatir was arrested and charged with crimes stemming from an armed robbery and murder which occurred earlier that year. In March 1976, the plaintiff was found guilty of the charges and was sentenced to life in prison. [FN2] Fatir was classified to serve his imprisonment at the Delaware Correctional Center ("DCC") in Smyrna, Delaware. Although the plaintiff presented a serious disciplinary problem at the beginning of his incarceration, by 1987, he had become a model prisoner. He became an active participant in positive aspects of prison life. He even began new programs designed to help prisoners cope with life behind bars. Fatir also became an author and sought after lecturer on prison life. Most important for the purposes of the present motion, after his initial infractions, Fatir was deemed to be a low security risk and was permitted to work in the prison's Central Supply as a clerk and computer programmer. [FN3]

FN2. The plaintiff was originally sentenced to death, but due to the constitutional infirmity of the Delaware death penalty statute, this sentence was later reduced to life without parole.

FN3. The Central Supply was technically on the prison grounds, but it was beyond the secure area of the prison fences. Thus, only inmates who presented low security risks were permitted to work in this area.

*3 On April 6, 1995, Fatir filed a complaint against the defendants. [FN4] The complaint asserted several causes of action. First, Fatir claimed, "Defendants violated plaintiff's constitutional protection against unreasonable searches and seizures and free speech by searching his computer and copying files without his permission." (D.I. 2 at 7.) Fatir also alleged, " For the past year, Plaintiff's mail has been tampered

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                       Page 3
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

with by mailroom officers.... Plaintiff has had incoming mail returned to sender without explanation and in violation of institutional mail regulations which require the mailroom officers to notify the inmates of any mail that they intend to send back to sender." (*Id.* at 10.)

> FN4. The defendants Danberg, Taylor, and Schotzberger were not added until 1997. Additionally, Fatir has voluntarily withdrawn certain claims. Therefore, the defendants Boyle, Hosterman, Cunningham, and Gullege are no longer defendants in this action.

On May 16, 1996, Fatir wrote a letter to the court. (D.I.19.) In the letter, Fatir alleged that "On May 14, 1996, Major Barry Halwk and Lawrence McGwiggen [sic] seized my personal computer, my file on this case, books I own including "The Prisoner's Self-Help Litigation Manual" and computer disks." (*Id.*) Fatir also asserted that " Defendant Dowdy has repeatedly mishandled legal mail coming into the institution for me. He has also stopped mail leaving the institution from directly going to the persons to whom the mail is addressed." (*Id.*) Fatir further stated, "I would request that the court please treat this letter as a Motion for a Preliminary Injunction." (Id.) At no point did Fatir refer to his letter as a motion to amend.

On May 23, 1996, Judge McKelvie issued an order addressing Fatir's letter-motion. The order stated as follows:
On May 20, 1996, plaintiff sent a letter to the court stating that ... Major Barry Hawk and McGwiggen [sic], had seized his personal computer, his file for this litigation, certain books, including plaintiff's " The Prisoner's Self-Help Litigation Manual," and computer disks. In addition, the plaintiff asserts *as he did in his original complaint* that defendant Dowdy is interfering with his personal and legal mail. Plaintiff seeks a temporary restraining order and preliminary injunction to order the return of his property and to prevent DCC officials from tampering with his mail. The court will construe plaintiff's letter as a proposed amendment to his original complaint and as a motion for injunctive relief.
Plaintiff's proposed amendment to his complaint appears to claim that Hawk and McGwiggen's [sic] seizure of his personal property violates his Fourteenth Amendment right to due process. In addition, he appears to claim that their seizure of his legal materials and Dowdy's *continued* interference with legal mail violates his First Amendment right of access to the courts. As plaintiff still lacks the funds to maintain this action, and as these claims do not appear frivolous, the court will allow plaintiff to proceed *in forma pauperis* on these claims in addition to those identified by the court's October 31, 1995 Order granting plaintiff [sic] to proceed *in forma pauperis* against defendants Dowdy and Ryan.

*4 (D.I. 20 at 1)(emphasis added).

On June 22, 1996, approximately three months after Judge McKelvie granted the "motion to amend," Fatir gave a speech which criticized the policies of the warden, the defendant Robert Snyder, as racist. One week later, on June 29, 1996, Fatir was informed that he would be transferred to an Arizona prison pursuant to the Interstate Corrections Compact. Fatir arrived at Santa Rita prison in Arizona on July 5, 1996. On January 10, 1997, Fatir filed a motion to amend with a new complaint attached. (D.I.30.) In that complaint he alleged retaliatory transfer, retaliation for First Amendment violations, and deprivation of due process resulting from the seizure of certain of his personal effects lost during his transfer, including books, a television, a radio, legal materials, a computer, cosmetics, and other assorted items. (*Id.* at 5.) In their response to the motion, the defendants asserted that the retaliation claims should be considered separate causes of action under section 1983. (D.I.41.) Without addressing the defendants' contention, Judge McKelvie granted Fatir's motion to amend. (D.I. 44 .)

In April 1998, Fatir filed a second motion for appointment of counsel. [FN5] In September 1998, the case was reassigned to this court. The court granted the motion for appointment of counsel on June 20, 2000. Upon securing new counsel, the plaintiff was permitted to file an amended complaint

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

over the objection of the defendants. The amended complaint ("the 2001 complaint") was deemed filed on January 29, 2001. The 2001 Complaint asserted nine causes of action, seven of which remain in this litigation.[FN6] The 2001 complaint did not present new causes of action. Rather, it contained reformulations of Fatir's prior allegations. Count One alleged that the defendants had tampered with Fatir's "personal correspondence and legal mail." (D.I. 80 at 19.) Count Two alleged interference with Fatir's legal mail, specifically. (*Id.* at 20.) Count Four asserted that Hawlk and McGuigan had violated Fatir's Fourth Amendment rights against unreasonable searches and seizures and his Fourteenth Amendment right to due process by seizing his litigation materials and the other items listed in the May 1996 letter. (*Id.* at 21.) Count Five asserts that Fatir was retaliated against for engaging in speech protected by the First Amendment. Count Six contends that the plaintiff was transferred in retaliation for filing this lawsuit. Count Eight asserts that the defendants violated the plaintiff's right to due process and deprived him of his property when they removed certain property, including books, a radio, a television, legal material, a computer, cosmetics, stamps, shoes, clothing, and two photo albums. (*Id.* at 24.) Count Nine alleges that the defendants' interference with his legal mail violated his right to have access to the courts. (*Id.* at 25.)

> FN5. Fatir filed his first motion for appointment of counsel in August 1997. This motion was denied by Judge McKelvie in November 1997. (D.I.44.)
>
> FN6. The plaintiff has voluntarily withdrawn Count Three, an equal protection claim, and Count Seven, a due process claim based upon the plaintiff's reclassification upon arrival in Arizona. Since these claims are no longer being litigated, the court will not address them.

The court issued a scheduling order in this case on May 10, 2001. That order set the dispositive motion deadline at September 28, 2001. However, by agreement of the parties and the court, the deadline was later changed to November 16, 2001. Thus, dispositive motions were to be filed on November 16, 2001, the answering briefs were due on January 25, 2002, and the reply briefs were due on February 1, 2002.

*5 The defendants filed their summary judgment motion on November 16, 2001, as scheduled. The motion argues, *inter alia,* that summary judgment should be granted in the defendants' favor because Fatir had failed to exhaust his administrative remedies before filing his complaint as required by the PLRA. The record indicates that the DCC had a formal grievance procedure for certain claims. The defendants have submitted an inmate grievance handbook and other materials establishing the existence of this grievance procedure. Also, Fatir testified at his deposition that there was a grievance procedure at the DCC. (D.I. 130 at A073.) When asked about his attempts at exhaustion during his deposition, Fatir testified as follows:
Q: Did you ever file a grievance?
A: Yes.
Q: More than one?
A: I can only recall one ...
Q: [T]here's a form they use, correct?
A: There ... was, I think, a letter you had to write to begin the grievance process.
Q: It was a form you had to fill in wasn't it?
A: Maybe. I don't know. I don't recall.
Q: And when you filled in this form, where would it go?
A: When the grievance procedure was functioning as ordered by the court, it would go to the grievance coordinator.
Q: And then from where? Would there be a hearing scheduled for it?
A: There would be a hearing for it.
Q: And after that there would be a decision made?
A: Yes.
Q: And after that you could appeal the decision?
A: Yes.
Q: To who [sic]?
A: To the warden.
....
A: The person who would be the statewide grievance coordinator [left], and the grievance procedure pretty much collapsed.
Q: There are still people that file grievances aren't there?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                    Page 5
Not Reported in F.Supp.2d, 2002 WL 2018824 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

A: I would imagine so.
...
Q: In any event, in none of the instances that you complained about in the second amended complaint did you in any way file a grievance form and turn it in, correct?
A: After having been told that my issues were nongrievable ...
Q: My question was did you actually file a written grievance and the answer is no?
A: No, I did not.
Q: Now, what things were you told were not grievable?
A: I was told that the mail tampering was not grievable. I was told that my job issues were not grievable because they were classification, and I was told that classification matters are not grievable. I was told that all the seizure of my materials, my computer itself, was not grievable, and--
Q: Just so we're clear--
A: the grievance board is not going to handle anything else from here.
Q: But you never filed a grievance and had the grievance board say that?
A: Well, the grievance coordinator said--
Q: My question is still the same. You never actually filed a grievance and had them say, "This is not grievable"?
A: That's a two part question ...
Q: Did you ever file a grievance form?
A: No.
Q: Since you never filed a grievance, you never heard back from the grievance board?
*6 A: I heard back. They don't have them.

In his answer to the defendant's motion, filed on February 15, 2002, the plaintiff responded that the PLRA was enacted on April 26, 1996. Fatir thus argued that since his original complaint was filed in 1995, and the PLRA was not retroactive, his case was exempt from the exhaustion requirements of the PLRA. He also argued that with regard to the 1997 claims surrounding his transfer to Arizona, there was no available "formal" grievance procedure. The defendants assert that upon his transfer, Fatir was instructed to "contact the Interstate Compact Administrator for any legal issues." (D.I. 143 at 21-22.) The defendants, however, cite no record evidence in support of this claim. A review of the depositions given by those responsible for the transfer (namely the defendants Shotzberger, Ryan, Danberg, Taylor, as well as Mr. Stanley Turner) fails to clearly identify exactly how Fatir could have or would have been able to file a grievance regarding his transfer claims. When asked how an inmate who disagreed with a transfer might challenge this decision, the defendant Taylor testified that "They write letters all the time. They write grievances all the time." (D.I. 130 at 157 .) However, Taylor offered no testimony as to the exact operation or regulations of the purported grievance system, or to whom the grievance would be sent. Colleen Shotzberger, the Interstate Compact Administrator, testified that she gave Fatir a memo concerning the transfer of his legal materials, but did not testify that this memo or any other document notified Fatir of the appropriate grievance procedure for his transfer. (*Id.* at 299.) The prison hearing officer, Scott Turner, testified that if Fatir had indicated that he had a problem with the transfer, Turner might have been able to intervene. Additionally, Turner stated that there was no appeal from the decision to transfer. However, when Turner gave these responses, he was not specifically being asked about grievance procedures. (*Id.* at 120.) The record thus fails to clearly demonstrate how, or to whom, Fatir might appeal the transfer decision.

In their response to the plaintiff's motion, the defendants replied that although the PLRA might not be retroactive, thus saving the claims in the 1995 complaint, it did not save any claim asserted in an amended complaint after the PLRA was filed.

On February 19, 2002, a mere four days after answering the defendants' motion for summary judgment, the plaintiff filed a motion for leave to amend Count Eight of the 2001 Complaint. At present, Count Eight alleges that the defendants deprived Fatir of certain personal property, thus violating his due process rights. Fatir seeks to amend this count to instead assert a state law claim of conversion. The defendants oppose the amendment on two grounds. First, they assert that the plaintiff's motion is untimely, as it comes after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.