# EXHIBIT Q
# (con't 6)



Not Reported in F.Supp.2d                                                                                             Page 1

Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Brown v. Byrd
E.D.Pa.,2000.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
STANLEY BROWN, Plaintiff,
v.
MARY V. LEFTRIDGE BYRD, et al., Defendants.
No. CIV.A. 00-3118.

Dec. 1, 2000

### MEMORANDUM AND ORDER

KATZ, Senior Judge.

*1 Plaintiff Stanley Brown is an African American inmate who, at the time relevant to this action, was housed at the State Correctional Institute at Chester (SCI-Chester). He brings several claims of constitutional violations under 42 U.S.C. § 1983. His primary allegation is that officials at SCI-Chester, including defendant Sister Joan Henkel, discriminate against inmates on the basis of race in assigning cells. He also alleges that defendants Sergeant Johnnie Byers, Lieutenant Michelle Madison and non-moving defendant Nurse Judy Lubin harassed him because he is Muslim; that he received inadequate medical treatment; that defendant Supervisor Mary Leftridge Byrd was deliberately indifferent to the racial and religious discrimination and failed to train, discipline or otherwise supervise the other defendants; and that defendant Ms. Roxina Rumley, SCI-Chester's Health Care Administrator, failed to adequately supervise the nursing staff and responded to his complaints sarcastically. Now before the court is a motion by the Commonwealth employees for summary judgment.FN1

  FN1. . Plaintiff's complaint also alleges claims against two non-Commonwealth employees, Nurse Supervisor Shirley Laws-Smith and Nurse Lubin. His claim against defendant Nurse Supervisor Laws-Smith is based on failure to properly supervise Nurse Lubin. These defendants have not joined the instant motion but have filed a separate summary judgment motion.

I. Background FN2

  FN2. . The factual information in this section is drawn from the undisputed facts, except where noted. The facts are presented in the light most favorable to Mr. Brown and all reasonable inferences are drawn in his favor.

A. Racial Discrimination

Mr. Brown alleges that officials at SCI-Chester assigned him to a cell based solely on his his race when he arrived at the institution on February 9, 2000, and when he was housed in the A-Unit, C-Pod from March 8, 2000, to April 26, 2000. Specifically, he claims that African American and white inmates are not allowed to share cells at SCI-Chester.FN3

  FN3. . According to Mr. Brown's complaint, Hispanic and Asian inmates " can be housed with whites." Compl. § V.5.

The Department of Corrections (DOC) has identified a non-exhaustive list of factors to be evaluated in determining compatibility of cell mates, including familial relationships, age, geographic identity, any racial and ethnic biases of the inmates to be housed together, and interests. *See* Def. Ex. 18 (DOC Policy Statement 6.5.3, Single Celling ("Z"-Code) and Double Celling Housing Policy) at 3. Institutions may also consider other appropriate factors. *See id.* The policy also states that consideration of inmates' racial and ethnic biases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 2005 WL 724175 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

U.S. at 11-12).

The *Gallas* Court went on to explain that the factors used to determine whether an act is judicial "relate to the nature of the act itself, i.e. whether it is a function normally performed by a judge, and to the expectations of the parties, i.e. whether they dealt with the judge in his judicial capacity." *Id.* (quoting *Stump v. Sparkman,* 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978)). The second element of the test requires courts to distinguish between acts taken in the "clear absence of all jurisdiction," and acts taken in "excess of jurisdiction." *Gallas v. Supreme Court of Pennsylvania,* 211 F.3d at 769. Acts taken in the "clear absence of jurisdiction" do not enjoy the protection of absolute immunity, while acts taken merely in "excess of jurisdiction" do enjoy such protection. *Id.*

*3 In this case, Waples alleges that Graves violated his constitutional rights by sentencing him to confinement beyond the term prescribed by the Delaware statute. (D.I.5) As a Superior Court Judge, Graves was clearly acting in his "judicial capacity" when he sentenced Waples. Furthermore, Waples has not alleged that Graves acted "in the absence of all jurisdiction." To the contrary, Waples clearly alleges that "Graves was my sentencing Judge." (D.I.5) Consequently, Graves is immune from suit for monetary liability under 42 U.S.C. § 1983. Waples' claim against Graves lacks an arguable basis in law or in fact.

2. Waples' Claims Against Brady and Kearney

Waples alleges that as the "Chief law officer" of the State, Brady is "responsible for advising the government on legal matters and representing it in litigation." (D.I.5) Thus, Waples appears to be alleging that because of her position as the Attorney General, Brady is ultimately responsible for his alleged unlawful incarceration. Waples' claim against Brady must fail because it rests solely on a theory of vicarious or supervisory liability. Supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. *See Monell v. Dep't. of Social Services of City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). In order for a supervisory public official to be held liable for a subordinate's constitutional tort, the official must either be the " moving force [behind] the constitutional violation" or exhibit "deliberate indifference to the plight of the person deprived." *Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989) (citing *City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Waples does not raise any specific allegations regarding Brady. Rather, Waples argues that Brady is liable simply because of her supervisory position. (D.I. 5; D.I. 8)

Similarly, Waples' claim against Kearney must also fail. In *Sample,* the Third Circuit held that in order to establish § 1983 liability against a prison official for incarceration "without penological justification," a plaintiff must demonstrate the following elements: 1) that the prison official had knowledge of the prisoner's problem; 2) that the official either failed to act or took only ineffectual action, thus demonstrating deliberate indifference to the prisoner's plight; and, 3) that there is a causal connection between the official's response to the problem, and the unjustified detention. *Sample v. Diecks,* 885 F.2d at 1110. In this case, Waples states that he never filed a grievance, or in anyway brought his claim to the attention of prison officials at SCI before his release because, he alleges, he " did not know until after the fact." (D.I. 2 at 2) Clearly, this is not a case where prison officials were put on notice and then simply refused to investigate Waples' claim. *C.f. Alexander v. Perrill,* 916 F.2d 1392, 1398 (9th Cir.1998)(holding that warden and administrative systems manager had clearly established duty to investigate credible evidence regarding sentence miscalculation).

*4 Nothing in the complaint indicates that either Brady or Kearney were the "driving force [behind]," or that they were even aware of Waples' allegations and remained "deliberately indifferent" to his plight. *Sample v. Diecks,* 885 F.2d at 1118. Consequently, Waples' claims against Brady and Kearney have no arguable basis in law or in fact.

3. Waples' Request for Damages Based on "Mental

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                          Page 2
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

shall not be interpreted to mean that only inmates of the same race should be celled together-rather its intent is to ensure that inmates who have exhibited documented history of interracial violence or a propensity to engage in such, should not be celled with a person upon whom they would be likely to act out.

*Id.*

When Mr. Brown first arrived at SCI-Chester, he was assigned to B-Unit. According to Mr. Brown, he was not interviewed regarding any compatibility factors prior to receiving his cell assignment.[FN4] According to Mark Jackson, who is the B-Unit manager, inmate information reports indicate that Mr. Brown and his original cell mate were compatible in that they were approximately the same age (Mr. Brown was born in 1959 and his cell mate in 1961), committed similar offenses (robbery and burglary), were from the Delaware Valley area, and reported Islam as their religion. *See* Jackson Decl. ¶ 4.

>   FN4. . Mr. Brown makes these allegations in his response to defendants' motion. He does not submit any affidavit or factual material in support of his allegations. However, given plaintiff's *pro se* status, the court will consider the allegations as if they had been appropriately submitted.

Mr. Brown transferred to A-Unit in March of this year. A-Unit is a therapeutic community where inmates participate in a drug and alcohol treatment program. As part of the program, they are encouraged to share their feelings and to challenge each other about inappropriate behavior. Because of the intensive and confrontational nature of the program, the A-Unit has a high rate of physical violence within SCI-Chester. According to Sister Henkel, the A-Unit manager, her primary consideration in making cell assignments is whether she believes the inmates will be compatible. Sister Henkel is aware of the DOC policy; she also attempts to accommodate inmates who indicate that they would like to share a cell, if the inmates are not likely to be a negative influence on each other. Henkel Decl. ¶ 19. Sister Henkel has noticed that Muslims frequently request to be celled with other Muslims or with non-Muslims who show respect for their religious practices. She believes that certain religious practices of Muslims, such as praying five times a day and certain cleanliness habits, can lead to friction if a cell mate is insensitive or disrespectful of those practices. *See id.* ¶ 6. In addition,

*2 [s]ometimes inmates request cell mates who are relatives or friends, or who come from the same neighborhoods. Many times, the Spanish language becomes a factor that supports an inmate request for a cell mate. The result is that inmates who ask to cell together are frequently of the same race, ethnicity, and/or cultural background.

*Id.* ¶ 19.

When Mr. Brown entered the A-Unit on March 8, 2000, he was interviewed by Sister Henkel so that she could determine an appropriate assignment. Mr. Brown indicated that he wanted a bottom bunk but otherwise did not express any preferences regarding his cell mate. Sister Henkel assigned Mr. Brown to a cell with Leroy Glenn, an African American inmate who had moved to A-Unit at the same time as Mr. Brown because she believed that they would be compatible based on their age and religion. Mr. Glenn's self-reported religion is Islam [FN5] and at the time of the assignment, he was 50 and Mr. Brown was 41. This information is available from the inmates' reports. *See* Def. Ex. 5 (Glenn Inmate Information Report; Brown Inmate Information Report).[FN6] Sister Henkel assigned the bottom bunk to Mr. Brown. Mr. Glenn indicated to her that if a bottom bunk became available, he would like to be moved to it.

>   FN5. . According to Mr. Brown, Mr. Glenn is a "member of the 'Nation of Islam,' which is different from my religion (Islam)." Brown Decl. (doc. 41) ¶ 2.

>   FN6. . Although Sister Henkel states that she also believed Mr. Glenn and Mr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d   Page 3
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Brown to be compatible based on their agreement to cell together, Mr. Brown asserts that Sister Henkel questioned him solely regarding whether he needed a bottom bunk, and did not question him regarding religion or "anything else" when she interviewed him on March 8. *See* Brown Decl.(doc. 41) ¶ 3. Construing the facts in Mr. Brown's favor, the court finds for the purposes of this motion that he did not agree to share a cell with Mr. Glenn.

Shortly after arriving in the A-Unit, Mr. Brown began submitting complaints about his cell assignment. His first two complaints concerned the poor television reception in his cell. *See* Def. Ex. 2 (Brown Inmate Requests, dated March 9, 2000, and March 15, 2000). In his third request, he identified a specific cell, cell number 14, to which he wished to be moved. *Id.* (Brown Inmate Request, dated March 19, 2000). At the time of Mr. Brown's request, cell 14 was occupied by two white inmates, Mr. Burch and Mr. Georigi. Mr. Burch left shortly afterwards and was replaced by Mr. Fritz, a white inmate who had requested to cell with Mr. Georigi. According to Sister Henkel, Mr. Georigi had agreed to take a top bunk when he and Mr. Burch requested to cell together, but Mr. Georigi expected to be returned to a bottom bunk when Mr. Burch left. Mr. Brown alleges that Sister Henkel delayed in responding to his request to move into cell 14 until after it was occupied by Mr. Fritz.

Mr. Brown testified that the basis of his allegation of racial discrimination is his observation that African American and white inmates do not share cells in the A-Unit, rather than any statements made by Sister Henkel. *See* Brown Dep. at 30-31. According to the records submitted by the defendants, at the time of Mr. Brown's stay in A-Unit from March 8, 2000, to April 26, 2000, no cells were shared by African Americans and white inmates. *See* Def. Ex. 27.[FN7] Both before and after his stay, some cells in A-Unit did house both African American and white inmates, although the number was never higher than eight cells integrated in this manner on September 14, 2000. Each of A-Unit's four pods has 32 cells, although the number of cells available for double celling varies depending on the number of inmates requiring a single cell and the availability of cells.

FN7. . Defendant's exhibit 27 was drawn from old cell rosters. The information is incomplete, because cell rosters are frequently discarded. *See* Henkel Decl. ¶ ¶ 18, 20. For example, the only roster reports available during the plaintiff's stay in A Unit are from March 9, 20, 24, and 31, and April 4, 2000.

*3 Mr. Brown disputes the accuracy of old cell rosters submitted by Sister Henkel, pointing out that the cell rosters for February 16, 1999, indicate that the same white inmate is assigned to two different cells: first in A Unit, A-Pod with a black inmate, and second in A Unit, B-Pod with another white inmate. *See* Def. Ex. 4 (February 16, 1999, A Unit Cell Assignments). In her supplemental declaration, Sister Henkel notes that the March 10, 1999, roster indicates the same thing and ascribes this double assignment to a recording error. *See* Henkel Supp. Decl. ¶ 3.

In terms of the prison population, on August 15, 2000, SCI-Chester housed 642 African American inmates, 166 Caucasian inmates, 112 Hispanic inmates, and 2 inmates identified as "other." According to Superintendent Leftridge Byrd, the racial breakdown on August 15 is typical for the prison this year. According to Sister Henkel, the majority of inmates in A-Unit is African American, " ranging from a slight majority to up to two thirds of the unit's population." Henkel Decl. ¶ 21. Defendants have not produced comprehensive figures regarding the integration of cells at SCI-Chester generally.

According to Superintendent Leftridge Byrd, she has always emphasized to her staff that she will not tolerate race, ethnic or gender discrimination at SCI-Chester, either among staff or between staff and inmates. Upon learning of Mr. Brown's lawsuit, she gave a verbal order to staff reminding them that racial discrimination was impermissible.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 4
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

### B. Remaining Allegations

According to Mr. Brown, Sergeant Byers and Lieutenant Madison frequently nag him about his dress, telling him to tuck his shirt in, turn down his collar, or unroll his pants leg. He alleges that this is religious discrimination because Muslims often roll up their pants. He also states that Sergeant Byers has made derogatory comments to him, such as " you damn Muslims." Mr. Brown did not submit any written grievances regarding these instances of harassment. In addition, Mr. Brown claims that Sergeant Byers was disrespectful to him in May of this year while he was visiting with his family. Mr. Brown administratively exhausted his grievance regarding this incident, although not until after he filed his complaint in this action.

He also alleges that he did not receive medical treatment after he reported blood in his stool in June of this year and that he has not received necessary dental care. Mr. Brown's complaints against Ms. Rumley stem from her failure to supervise Nurse Lubin, whom he alleges called him an "asshole." According to Ms. Rumley, she investigated the complaint and reminded medical staff members that they must act with professional integrity. *See* Rumley Decl. ¶ 6. Mr. Brown also did not submit any grievances, in accordance with DOC policy, regarding the lack of medical care or Ms. Rumley's failure to supervise.

### II. Discussion [FN8]

FN8. . Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter. Rather, it determines whether or not there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to, and all reasonable inferences must be drawn in favor of, the non-moving party. *See id.* at 256.

The moving party has the burden of showing there are no genuine issues of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Mathews v. Lancaster Gen. Hosp.,* 87 F.3d 624, 639 (3d Cir.1996). In response, the non-moving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings. *See Anderson,* 477 U.S. at 249; *Celotex,* 477 U.S. at 325; *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989).

### A. Racial Discrimination

*4 In order to demonstrate a violation of the Equal Protection clause, a plaintiff must show more than discriminatory impact. *See Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 264-65, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). Rather, "[p]roof of racially discriminatory intent or purpose is required[.]" *Id.* at 265; *see also Simpson v. Horn,* 80 F.Supp.2d 477, 481 (E.D.Pa.2000) (holding that prisoner cannot prevail on equal protection claim by showing that prison policy has the effect of segregating prisoners by race, but must demonstrate defendants' intent to cause segregation). "Discriminatory purpose ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part because of, and not merely in spite of, its adverse effects upon an identifiable group." *Personnel Adm'r v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979) (citation, punctuation omitted); *see also Hernandez v. New York,* 500 U.S. 352, 359-60, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Discriminatory impact is a relevant factor in evaluating discriminatory intent, " but it is not the sole touchstone of an invidious

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.