# EXHIBIT Q
# (con't 7)

Not Reported in F.Supp.2d                                                                                                           Page 5
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

racial discrimination forbidden by the Constitution." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

As a general matter, "[p]risoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell,* 418 U.S. 539, 556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). While prisoners do not lose their constitutional rights when they become incarcerated, those rights are necessarily limited. *See Waterman v. Farmer,* 183 F.3d 208, 212 (3d Cir.1999). Thus, "racial segregation, which is unconstitutional outside prisons, is unconstitutional within prisons, save for 'the necessities of prison security and discipline.'" *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (per curiam) (quoting *Lee,* 390 U.S. at 334); *see also Johnson v. California,* 207 F.3d 650, 655 (9th Cir.2000); *Sockwell v. Phelps,* 20 F.3d 187, 191 (5th Cir.1994). Constitutional challenges to laws, regulations, and policies governing prison management must be examined under the framework of *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1986). *See Waterman,* 183 F.3d at 212. In *Turner,* the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* 482 U.S. at 89. According to the Court, this less stringent standard of review is necessary because "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." *Id.*

Construing all evidence in the plaintiff's favor, Mr. Brown has failed to produce evidence of discriminatory purpose, other than evidence of discriminatory impact. While Mr. Brown is correct in arguing that some of the evidence produced by the defendants regarding integration of cells appears unreliable, and the remaining evidence suggests that African Americans and whites only rarely share cells, he has not shown that this situation is the result of purposeful discrimination. Rather, he relies on his own observation of the lack of integration, his own experience in sharing cells only with African American inmates, and the defendants' statistical evidence, which, even if taken as proof that the prison population is largely segregated, does not, in itself, evidence a discriminatory purpose.

*5 The only evidence that Mr. Brown has produced that is arguably evidence of discriminatory purpose is his allegation that Sister Henkel did not move him into cell 14 as he requested because doing so would result in an integrated cell. Even assuming that Mr. Brown is correct that Sister Henkel delayed in responding to his request until another white inmate was moved into cell 14, Sister Henkel has articulated non-discriminatory reasons for her decision to pair two white inmates: Mr. Georigi and Mr. Fritz requested to share a cell, something she tries to accommodate if possible, and both Mr. Brown and Mr. Georigi wanted a bottom bunk. Mr. Brown has not demonstrated that Sister Henkel's decision to put two white inmates in cell 14 was because of race. *See Feeney,* 442 U.S. at 279.

Mr. Brown's evidence stands in stark contrast to the plaintiff's evidence in *Simpson,* where the court denied summary judgment on the plaintiff's claims of racial segregation at SCI-Graterford because the plaintiff had put forth sufficient evidence to establish a genuine issue of fact on the question of intent. *See id.,* 80 F.Supp. at 482. Simpson's evidence included a statement by an unnamed guard that " 'you know we don't play that up here anymore ' " in response to the plaintiff's request to cell with a white inmate; a chart in a unit manager's office that identified cells as black, white or Hispanic; and a memorandum from the Deputy Superintendent directing that " 'effective immediately, the practice of placing inmates of the same race in the same cell will be modified.' " *Id.,* at 482-84. On the other hand, Mr. Brown's suspicion that Sister Henkel delayed in responding to his request to move into cell 14 in order to avoid assigning him a white cell mate and the statistical evidence indicating that African Americans and whites rarely share cells are not enough to establish discriminatory purpose, given the defendants' evidence that cell assignments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 6
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

are made based on compatibility of non-discriminatory factors.

Moreover, even if the defendants' policy of assigning cells based on perceived compatibility impinges on Mr. Brown's constitutional right to equal protection, that policy withstands *Turner* scrutiny in that it is reasonably related to the prison's legitimate penological interests in the safety and security of its prison. *See Simpson,* 80 F.Supp.2d at 480. The DOC policy clearly states that only an inmate's racial bias, not his race, may be considered as a compatibility factor and that the policy should not be interpreted to allow assignments based on race. Nor has Mr. Brown demonstrated that officials at SCI-Chester failed to comply with the DOC policy. Mr. Brown's initial cell assignment in B-Unit was based on compatibility in terms of age, religion, geographical similarity, and roughly equivalent criminal offenses. In A-Unit, compatibility of cell mates is an especially pressing concern, given the high incidence of violence in that unit resulting from the treatment program that requires inmates to both support and confront each other in their recoveries. Sister Henkel's pairing of Mr. Brown and Mr. Glenn was based on her perception that they were compatible because of their relative closeness in age; her belief that they were both Muslim; and Mr. Glenn's willingness to take a top bunk, at least temporarily. In so far as Sister Henkel did not move Mr. Brown into a cell with Mr. Georigi, as noted, this decision was based on her belief that Mr. Fritz and Mr. Georigi were compatible since they had requested to cell together and Mr. Fritz was apparently willing to accommodate Mr. Georigi's desire for a bottom bunk. Thus, Mr. Brown has not shown that his cell assignments were in violation of DOC policy. The court acknowledges the danger that, unless care is exercised, racial segregation may occur under the guise of assignment according to " compatibility." Nevertheless, given the lack of evidence regarding discriminatory intent and the deference to be accorded to prison officials under *Turner,* Mr. Brown has not demonstrated that he has been subjected to constitutionally impermissible racial discrimination.

B. Other Allegations [FN9]

FN9. . Mr. Brown's response to the defendants' motion for summary judgment is confined to his complaints of racial discrimination; supervisory liability and failure to train; and his contention that he exhausted his administrative remedies regarding the racial discrimination. Given Mr. Brown's *pro se* status, the court does not assume that he abandons his other claims.

1. Supervisory Liability

**\*6** Mr. Brown alleges that Ms. Leftridge Byrd, in her capacity as the superintendent of SCI-Chester, is responsible for the discrimination in the assignment of cell mates. As a preliminary matter, because the court has found that there was no discrimination in the assignment of Mr. Brown's cell mates, there cannot be a claim against Ms. Leftridge Byrd for her failure to prevent or correct such discrimination. *See Telepo v. Palmer Township,* 40 F.Supp.2d 596, 612 (E.D.Pa.1999) (holding that if there is no underlying constitutional violation by subordinates, there is claim supervisory liability against the superior).

Even assuming, *arguendo,* that Mr. Brown has demonstrated discrimination in the assignment of cell mates at SCI-Chester, his claim against Ms. Leftridge Byrd still fails. There is no respondeat superior liability for a claim brought under section 1983, *see, e.g., Polk County v. Dodson,* 452 U.S. 312, 325 (1981); *Rouse v. Plantier,* 182 F.3d 192, 200 (3d Cir.1999), as Mr. Brown acknowledges. In order to prevail on a claim of supervisory liability, a plaintiff must demonstrate both deliberate indifference by the superior and a close causal relationship between the identified deficiency and the plaintiff's ultimate injury. *See Sample v. Diecks,* 885 F.2d 1099, 1118 (3d Cir.1989); *see also id.* at 1117-18 (holding that the standards for municipal liability under section 1983 should be applied to individual liability for supervisors). The Third Circuit has noted that, in cases alleging supervisory liability, "the rubric 'supervision' entails, among

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 7

Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance, whether through individualized discipline or further rulemaking." *Id.* at 1116. A supervisor is liable for failing properly to train, discipline or control a subordinate only if the supervisor (1) either knew contemporaneously of the subordinate's offending behavior or knew of prior pattern of similar incidents or circumstances and (2) acted in a manner that reasonably could be found to communicate a message of approval to the subordinate. *See Montgomery v. De Simone,* 159 F.3d 120, 126-27 (3d Cir.1998); *see also Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1294 (3d Cir.1997) (holding that actual knowledge and acquiescence is sufficient to support a finding of supervisory liability).

Here, assuming that the cell assignments were discriminatory, Mr. Brown has put forth no evidence that Ms. Leftridge Byrd was contemporaneously aware of this or that she knew of a pattern of discrimination in cell assignments. In addition, Mr. Brown has failed to show that she acted in a manner that communicated her approval of such behavior. According to Ms. Leftridge Byrd, as superintendent of SCI-Chester, she has repeatedly emphasized to her staff that race, ethnic, and gender discrimination will not be tolerated, either among staff or between staff and inmates. She orally renewed this order upon learning of Mr. Brown's law suit. Thus, even assuming Mr. Brown had suffered racial discrimination, he has not carried his burden of proving supervisory liability against Ms. Leftridge Byrd.

Mr. Brown also alleges that Ms. Rumley is liable in her capacity as the SCI-Chester health care administrator for her failure to properly supervise Nurse Lubin. Even assuming, *arguendo,* that Mr. Brown can prevail on his claim that Nurse Lubin violated his constitutional rights, he has failed to show that Ms. Rumley should be held liable. There is no evidence that Ms. Rumley was contemporaneously aware of Nurse Lubin's alleged harassment, or that the nurse engaged in a pattern of behavior of which Ms. Rumley was aware. Moreover, upon learning of Mr. Brown's complaints regarding the nurse, Ms. Rumley investigated his claims and the medical staff was reminded that they must act with professional integrity. While Ms. Rumley refused to reveal whether Nurse Lubin was disciplined, her actions upon learning of the alleged constitutional violation cannot be reasonably construed as indicating approval.

*7 Finally, Mr. Brown's complaint appears to raise some claims regarding inadequate medical care stemming from an incident in June 2000 where he reported blood in his stool but did not receive medical treatment He also claims that he has not received necessary dental care. Because he has not sued any health care provider in connection with this claim, the court assumes that his medical care claims are brought against Ms. Leftridge Byrd and Ms. Rumley on a supervisory liability theory as well. Denial of medical care constitutes a constitutional violation where a prison official has been deliberately indifferent to the serious medical needs of an inmate. *See Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Monmouth County Correctional Inst. v. Lanzaro,* 834 F.2d 326, 346 (3d Cir.1987). In order to demonstrate deliberate indifference, a plaintiff must show that the official "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennen,* 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Under *Farmer,* deliberate indifference is a subjective inquiry-the official " must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Id.* Negligence on the part of the official will not sustain a claim of inadequate medical treatment. *See Durlmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993). Mr. Brown has produced no evidence that any health care provider at SCI-Chester was subjectively aware of a substantial risk of serious harm to him. Furthermore, even assuming his rights were violated by a health care provider, Mr. Brown has not demonstrated that Ms. Leftridge Byrd and Ms. Rumley were aware of any violation of this nature or that they acquiesced in a subordinate's behavior. Thus, Mr. Brown's claim of inadequate medical treatment fails because he has not shown an underlying constitutional violation or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 8
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

that Ms. Leftridge Byrd and Ms. Rumley are liable as supervisors.

### 2. Harassment

*8 Mr. Brown has produced evidence that Sergeant Byers made derogatory remarks regarding his religion. *See id.* at 93 (stating that Sergeant Byers had made remarks to him along the lines of "you damn Muslims"). Nevertheless, while distasteful and inappropriate, discriminatory statements, in and of themselves, do not rise to the level of a constitutional violation under 42 U.S.C. § 1983. *See, e.g. Haussman v. Fergus,* 894 F.Supp. 142, 149 (S.D.N.Y.1995) (stating that taunts, insults and racial slurs do not comprise an infringement of a constitutional guarantee); *Wright v. Santoro,* 714 F.Supp. 665, 667 (S.D.N.Y.1989) (holding that racially discriminatory statements, without more, do not amount to a constitutional violation in a prisoner civil rights action) *aff'd* 891 F.2d 278 (2d Cir.1989); *Bolin v. Rice,* No. C941003SI, 2000 WL 342676, at *4 (N.D.Cal. March 20, 2000) (holding that verbal harassment of inmate that did not burden inmate's ability to practice his religion was not a constitutional violation). Similarly, Mr. Brown' allegations of nagging by Lieutenant Madison and Sergeant Byers regarding his dress and his allegation that Sergeant Byers was disrespectful to him in the visiting room does not amount to religious harassment. He has not produced any evidence that either the nagging or the visiting room incident were motivated by his religion. In so far as Mr. Brown's complaint against defendant Rumley stems from her sarcastic responses to his grievances, those actions simply do not rise to the level of a constitutional violation.

### C. Failure to Exhaust Administrative Remedies

Alternatively, Mr. Brown has failed to exhaust his administrative remedies prior to filing his complaint in this action for his claims regarding harassment by Lieutenant Madison and Sergeant Byers, inadequate medical care, and supervisory liability against Ms. Rumley.[FN10] Under the Prison Litigation Reform Act of 1996, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The DOC provides for a three step inmate grievance process. *See* Def. Ex. 19 (DOC Consolidated Inmate Grievance Review System, Policy No. DC-ADM 804); *Booth v. Churner,* 206 F.3d 289, 292 n. 2 (3d Cir.2000) (setting forth the DOC grievance process). The first step is written submission of the grievance to the facility/regional grievance coordinator; the coordinator has ten working days to provide a written response to the initial grievance. *See Booth,* at 292 n. 2. If the inmate is not satisfied with the response, he or she has five days to make an intermediate appeal to the appropriate intermediate review personnel; again, the inmate must receive a response within ten working days. *Id.* The final step is an appeal, within seven days, to the Central Office Review Committee. *Id.*

> FN10. . There is a factual dispute on the question of whether Mr. Brown exhausted his claim regarding discriminatory practices in cell assignments, and accordingly, the court does not grant summary judgment on this issue on the basis of failure to exhaust administrative remedies.

Mr. Brown did not submit an initial grievance on his claims regarding Sergeant Byers or Lieutenant Madison's alleged religious harassment, his medical treatment, or Ms. Rumley's failure to adequately supervise the medical staff. Thus, these claims have not been exhausted. He did not administratively exhaust his claim of disrespectful treatment by Sergeant Byers in the visiting room until after he filed his complaint in the instant action.

### III. Conclusion [FN11]

> FN11. . The defendants also seek summary judgment on the basis of qualified

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 9
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

immunity. Because Mr. Brown has not established that his constitutional rights have been violated, the court does not decide the defendants' qualified immunity defense. *See Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (holding that in determining qualified immunity, "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all.")

\*9 Mr. Brown has not demonstrated that officials at SCI-Chester discriminated against him on the basis of race in his cell assignments. Nor has he demonstrated that the DOC policy regarding compatibility of cell mates, either in itself or as applied to him, is constitutionally invalid under *Turner.* His claims of religious harassment, inadequate medical treatment, and supervisory liability also fail. Accordingly, the court grants summary judgment in favor of the moving defendants.

An appropriate Order follows.

### *ORDER*

**AND NOW,** this 1 st day of December, 2000, upon consideration of the Motion for Summary Judgment of defendants Leftridge Byrd, Henkel, Rumley, Madison and Byers, and the response thereto, it is hereby **ORDERED** that the motion is **GRANTED.** Plaintiff's complaint against defendants Leftridge Byrd, Henkel, Rumley, Madison, and Byers is **DISMISSED** with prejudice.

E.D.Pa.,2000.
Brown v. Byrd
Not Reported in F.Supp.2d, 2000 WL 1780234 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2007, I electronically filed *Defendants' Opening Brief In Support of The Motion for Summary Judgment* with the Clerk of Court using CM/ECF. I hereby certify that on July 20, 2007, I have mailed by United States Postal Service, the document to the non-registered parties listed below:

James Johnson, Inmate
SBI # 155123
Sussex Correctional Institution
Post Office Box 500
Georgetown, DE 19947

Roderick Brown, Inmate
SBI # 315954
Sussex Correctional Institution
Post Office Box 500
Georgetown, DE 19947

Jerome Green, Inmate
SBI # 147772
Sussex Correctional Institution
Post Office Box 500
Georgetown, DE 19947

Jose Serpa, Inmate
SBI # 350322
Sussex Correctional Institution
Post Office Box 500
Georgetown, DE 19947

Anthony Morris, Inmate
SBI # 300363
Sussex Correctional Institution
Post Office Box 500
Georgetown, DE 19947

James A. Wilson
SBI #163663
DCC
1181 Paddock Road
Smyrna, DE 19977

/s/ Stacey Xarhoulakos
Stacey Xarhoulakos, (I.D. 4667)
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
stacey.xarhoulakos@state.de.us
*Attorney for Defendants*